# Illinois Official Reports

## Appellate Court

---

### *Biundo v. Bolton*, 2020 IL App (1st) 191970

---

| | |
|---|---|
| Appellate Court Caption | FARA BIUNDO, as Special Administrator of the Estate of Zenah S. Muhdi, Deceased, Plaintiff-Appellant, v. MICHAELINA BOLTON, M.D.; TRALE PERMAR, M.D.; HIUFUNG LAM, M.D.; ADVOCATE HEALTH AND HOSPITALS CORPORATION; and ADVOCATE CHRIST MEDICAL CENTER, Defendants-Appellees. |
| District & No. | First District, Third Division<br>No. 1-19-1970 |
| Filed | September 9, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2016-L-000102; the Hon. Daniel Joseph Lynch, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Ronald J. Broida, Joseph K. Nichele, and Nora H. McGuire, of Broida & Nichele, Ltd., of Naperville, for appellant.<br><br>Krista R. Frick, of Barker Castro Kuban & Steinback, LLC, of Chicago, for appellees. |

Panel           JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Howse and Justice Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1      Zenah S. Muhdi[1] died when she was 17 years old from a heroin overdose, the day after she was treated for a prior heroin overdose and discharged from Advocate Christ Medical Center's (ACMC) emergency department. Her mother, Fara Biundo, as special administrator of Muhdi's estate, sued ACMC, Advocate Health and Hospitals Corporation, and three emergency department physicians for negligence, alleging breach of the standard of care when Muhdi was not admitted or held after the first overdose, until she could be placed in an inpatient substance abuse facility. Biundo now appeals from the judgment entered on the jury's verdict in favor of the defendants, arguing that the trial court abused its discretion by granting the defendants' motions *in limine* Nos. 27 and 37 regarding the testimony of Biundo's retained emergency department expert, the jury's verdict was against the manifest weight of the evidence, and the trial court erred in denying Biundo's posttrial motion for judgment notwithstanding the verdict (JNOV) or a new trial. The defendants respond that motion *in limine* No. 27 was properly granted because Biundo's retained emergency department expert was not qualified to testify about a psychiatrist's standard of care, motion *in limine* No. 37 was properly granted because Biundo failed to disclose the purported opinion and because the expert's trial testimony indicates he did not actually hold that opinion and that Biundo's other arguments lack evidentiary support.

¶ 2      The trial court denied Biundo's motion for JNOV on August 29, 2019, and Biundo timely filed her notice of appeal on September 26, 2019. We have jurisdiction pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), from this appeal from a final judgment.

¶ 3      Biundo testified that she grew up in Burbank, Illinois, and raised Muhdi, her only child, in that community with the help of Muhdi's uncle, Angelo Biundo, and grandmother, Girolama Biundo. Muhdi's father, Fatooh Muhdi, had lived with Biundo and their daughter for two years after her birth in 1996, and he subsequently saw her every other weekend. Muhdi had two half-sisters and a half-brother. During Muhdi's junior year in high school, her grades slipped, she was depressed, and her mother found bags of white powder in Muhdi's bedroom, which testing confirmed were opioids. In June 2013, between Muhdi's junior and senior years in high school, Biundo found Muhdi slumped over in her bedroom with white powder next to her. Muhdi was taken to ACMC, and at the hospital, Biundo denied that her daughter had a history of illicit drug usage. Muhdi's toxicology test was positive for benzodiazepines, opioids, and cannabinoids. Before discharging Muhdi, ACMC gave Biundo information about drug treatment programs and facilities. Biundo and Muhdi returned to the emergency room later that same day following a motor vehicle accident while Biundo was driving. Muhdi admitted to

---

[1]The spellings "Muhdi" and "Mudhi" appear at various points in the parties' briefs and the record on appeal. We have used the spelling that was used by the medical personnel.

drinking alcohol and smoking marijuana. Biundo asked that Muhdi be discharged, and she was. Biundo researched drug treatment programs and found the Aspiro Wilderness (Aspiro) treatment program in Utah. In July 2013, Muhdi was taken to a different hospital, Advocate Good Samaritan Hospital, for symptoms of drug withdrawal. She again tested positive for benzodiazepines, opioids, and cannabinoids. Biundo told this hospital that Muhdi's problematic behavior, failing grades, and social withdrawal had started seven or eight months prior. This additional hospital also gave Biundo information about substance abuse programs. About a week later, on July 22, 2013, Biundo sent her daughter to the Aspiro facility.

¶ 4     Muhdi's Aspiro counselor, Tim Lowe, Ph.D., testified that upon her arrival, Muhdi was diagnosed with polysubstance dependence, meaning that she had "a real dependence on more than three controlled substances." Muhdi disclosed "many years" of drug abuse and "many more substances than just three," including cocaine, heroin, Xanax, ecstasy, LSD, mushrooms, marijuana, and alcohol. Lowe's notes indicated that Muhdi had "not had much structure or guidance in her life." Lowe also wrote that Muhdi recognized it had been difficult for her mother to send her away from home and that Muhdi "was grateful for the good choices [her] mom made in putting her in *** [the Aspiro] program." Biundo was surprised by the extent of Muhdi's drug use. Biundo received weekly updates from Lowe and was told that Muhdi was making progress but needed supervision and that the Aspiro treatment program took 7 to 10 weeks. Lowe recommended that after Muhdi completed the Aspiro program, she spend the next 12 months in a therapeutic boarding school. Before Muhdi could accomplish the Aspiro milestones, however, Biundo flew to Utah and on August 23, 2013, took Muhdi out of the program because Biundo missed her. Biundo had spoken with Lowe a few days earlier, understood that her daughter was not ready to be discharged from Aspiro, and said she would leave her daughter in the program. Lowe had advised Biundo that Muhdi's removal would be against medical advice. Lowe was not a medical doctor but had formed that opinion in consultation with a psychiatrist, a nurse, and about a half dozen therapists. Lowe had also advised Biundo that removing Muhdi from the Aspiro program prematurely made it likely that she would relapse into previous behaviors and that it was likely that Muhdi would use drugs and would overdose again. Lowe told Biundo that Muhdi required a higher level of treatment and support for a minimum of one year after graduation from Aspiro and that without it she would relapse. Lowe recommended that the 12 months of additional treatment include a minimum of three hours of therapy per week, consisting of one hour of psychological therapy, one hour of group therapy, and one hour of family therapy with Biundo and Muhdi together. Biundo was also advised that Muhdi required structure at home, including rules, boundaries, and accountability. On cross-examination, Lowe was asked about the costs of the Aspiro program and a therapeutic boarding school. On redirect, Lowe said during his conversation with Biundo about the risks and consequences of prematurely removing Muhdi from Aspiro, Biundo had never mentioned costs and only said that she missed Muhdi too much to have her away from home.

¶ 5     Biundo testified that Muhdi spent 32 or 34 days at Aspiro and that Biundo decided it was time for her daughter to come back to Illinois because Muhdi "looked good" and "was happy" and Biundo missed her. Lowe had said that Muhdi needed to be in a treatment program, so Biundo's plan was to enroll her daughter in Catholic high school for her senior year and sign her up for outpatient therapy at Rosecrance, which was an "outpatient/inpatient drug rehabilitation therapeutic center."

¶ 6     Muhdi's uncle, Angelo, testified that while the family was visiting Muhdi at the Aspiro program, they looked online for good schools; in Angelo's own schooling, he experienced a "big difference" between a public school and a Catholic school, and the family chose the Catholic high school in Rockford, Illinois. Angelo also testified that he was not involved in his sister's decision to withdraw Muhdi from the substance abuse program and that he did not know his niece had been withdrawn from Aspiro against medical advice.

¶ 7     Biundo testified that she decided against the therapeutic boarding school that Aspiro recommended because a boarding school would not permit Biundo to have visitation without an invitation. Biundo wanted to remove Muhdi from the environment in Burbank and was interested in the Catholic school in Rockford because the guidance counselor "knew of her difficulties" and "it seemed like they were more compassionate" and that "there would be more structure." Biundo thought that taking Muhdi to Rockford was "the best thing" that she could do for her daughter. Biundo and Muhdi moved in September 2013 to an apartment that Biundo chose across the street from the Catholic school so she could "better keep [an] eye on her [daughter]." Despite their move to Rockford, Biundo took Muhdi to Burbank every weekend when Biundo went to see family. Muhdi attended "one to three" sessions at Rosecrance, which might have been "on an as-needed basis." Biundo testified that it seemed her plan to help her daughter was working, until after the holidays, when Muhdi began "distancing herself."

¶ 8     Michaelina R. Bolton, M.D., testified that on January 18, 2014, at approximately 4 p.m., someone left Muhdi at the entrance of ACMC's emergency department. Muhdi was unresponsive and cyanotic but immediately attended to by Dr. Bolton and Trale Permar, M.D., who administered oxygen and Narcan, a heroin reversal agent. Dr. Bolton was board certified in emergency medicine and treated at least one drug overdose each week, and she was supervising Dr. Permar, who was a senior resident with similar experience treating overdoses. It was Dr. Bolton's opinion that Muhdi would have died without the medical intervention she received. Muhdi said that she had snorted two baggies of heroin but denied that she tried to harm herself. Someone who overdosed on heroin would typically be held for observation for four to six hours and then reassessed. Dr. Bolton charted that she anticipated that Muhdi's observation period would be six hours, when she would likely be medically stable and able to be discharged. By around 8:30 p.m., Muhdi had been weaned off the supplemental oxygen and was medically stable.

¶ 9     Dr. Bolton's testimony was corroborated by Dr. Permar. Dr. Permar had completed medical school and was about halfway through a three-year residency in emergency medicine at ACMC. Dr. Permar testified that in his experience, when someone is revived after intentionally overdosing, the person will be either tearful and obviously depressed or the person will have a "flat" affect, and that Muhdi, on the other hand, exhibited an "appropriate" mood and affect. Muhdi's demeanor was consistent with her denial that the overdose had been intentional. Muhdi remained medically stable through the remainder of Dr. Permar's shift. Unless there is a medical reason, an overdose patient will not be admitted to the hospital, and Muhdi remained medically stable. Dr. Permar made it a practice to provide a brief "intervention" to overdose patients by talking with them about the seriousness of what had occurred. When he talked with Muhdi about the dangers of her behavior, she "kind of chuckled" and recalled telling her friends, "the next time I use I might die." After Dr. Permar confirmed that Muhdi's overdose had been almost fatal, he again asked her whether she had tried to hurt herself or wanted to die. Although Muhdi again denied that was her intention, she

said she was depressed. Muhdi's observation hold was extended, and Dr. Permar called in a social worker for crisis consultation in order to connect Muhdi with drug treatment programs or a psychiatric placement if necessary. As a medical resident, Dr. Permar did not have authority to request the crisis consultation without discussing it with Dr. Bolton. He testified that his care and treatment of Muhdi was appropriate, complied with the standard of care, and did not proximately cause her death.

¶ 10    Dr. Bolton testified that she wrote a note in Muhdi's chart at about 10:15 p.m. documenting that Biundo had demanded that her daughter be admitted to the hospital or transferred for detoxification, but that Muhdi did not meet medical or psychiatric criteria for admission to a hospital, *i.e.*, she was medically stable, did not require medication to manage severe withdrawal symptoms, and was not suicidal, homicidal, or psychotic. Dr. Bolton testified that although there is probably a medical or biological basis for addiction, addiction is not treated as a medical condition in a hospital, and substance abuse treatment is a voluntary process that requires the patient to be engaged in the treatment. Therefore, in order for Muhdi to progress to substance abuse treatment, she would have to be discharged from the hospital. Dr. Bolton's 10:15 p.m. addendum to Muhdi's chart indicated that her recommendation to Biundo and Muhdi was for them to follow up with drug addiction services. ACMC, through a social worker, would provide information about resources and facilities in the area. Dr. Bolton testified that her care and treatment of Muhdi was appropriate, complied with the standard of care, and did not proximately cause Muhdi's death.

¶ 11    ACMC's emergency department used a "sign out" procedure in which an outgoing shift of physicians would sit down with the incoming team to go over the charts and lab results of the patients who were coming under the care of the incoming team. After the sign out procedure, when their shift ended later that night, Drs. Bolton and Permar left the hospital after 11 p.m.

¶ 12    At approximately 1 a.m. on January 19, 2014, Muhdi was seen by a licensed clinical social worker. The social worker had 18 years of experience at ACMC as a crisis intervention worker and psychiatric liaison, was concurrently working for three other hospitals in that same capacity, and was also the director of field education for the master of social work program at a local university. The social worker had first reviewed all of Muhdi's medical records at ACMC. She then woke up Muhdi and spoke with her and her mother separately about Muhdi's history of drug use, denial of being suicidal, and past and current treatment. Muhdi told the social worker that she had maintained sobriety for about a month after coming home from the program in Utah; she subsequently used heroin, cocaine, alcohol, and "pills"; her past and current "drug of choice" was heroin; she had not been suicidal; and she had accidentally overdosed on heroin thinking it was cocaine. Muhdi also said that she was depressed and anxious; that a physician prescribed an antidepressant which Muhdi stopped taking because it made it her "sick"; and that she was self-medicating with marijuana to address her depression. Muhdi said her counselor at Rosecrance thought Muhdi needed substance abuse inpatient treatment, but Muhdi disagreed and said she could stop using heroin whenever she wanted to stop. During this 1 a.m. meeting, the social worker observed that Muhdi was disheveled; had a flat affect; and appeared depressed, anxious, and irritable. After evaluating Muhdi for substance abuse issues and psychiatric issues, the social worker consulted with the hospital's director of psychiatry, Rian Rowles, D.O., and Muhdi's attending emergency department physician, Todd F. Hayward, D.O., and it was determined that Muhdi should be assessed by CARES/Stability Assessment Stabilization Services (SASS) to determine whether she needed

further mental health services or other services that SASS could provide. Because Muhdi said she stopped receiving services from Rosecrance, the social worker also contacted Rosecrance and was advised that Muhdi would need to be evaluated by SASS to determine her eligibility for substance abuse services. Both SASS and Rosecrance are separate entities from ACMC. While testifying, the social worker acknowledged her notation that Muhdi needed inpatient substance abuse treatment, but the social worker explained that she had never known of a patient being transferred from the emergency department to an inpatient substance abuse facility and that the social worker gave Muhdi written referrals to substance abuse treatment providers that could help her after she was discharged from ACMC. The social worker had previously worked for SASS and explained that the notation SASS made in Muhdi's record stating that she was "deflected" from inpatient services meant that SASS determined Muhdi did not require inpatient services to address the issues that she presented with.

¶ 13    At approximately 5:30 a.m. on January 19, 2014, Muhdi was evaluated by a licensed master social worker employed by SASS who determined that Muhdi was not suicidal and did not meet the criteria for psychiatric hospitalization. The social worker testified that substance abuse treatment was voluntary and that a 17-year-old could not be involuntarily admitted for substance abuse counseling. The plan was for Muhdi to follow up with Rosecrance for outpatient services and follow up with SASS for assistance in connecting with services available to her.

¶ 14    The next team of physicians to take over Muhdi's care were Dr. Hiufang S. Lam and a resident, Dr. Stephan Walchuk, whose shift started at 6 a.m. on January 19, 2014. In 2014, Dr. Walchuk was in his third and final year of residency in ACMC's emergency department. Dr. Walchuk's notes in Muhdi's record from the "sign out" process indicated that the overnight team of physicians told Dr. Walchuk that Muhdi was medically stable and was not suicidal or homicidal and that the social worker indicated she did not need psychiatric hospitalization. Dr. Walchuk testified that his note "dispo per SASS" meant that after Muhdi was discharged from the emergency department, SASS would provide the next step or next disposition, whether that was referring Muhdi to counseling or to an inpatient substance abuse rehabilitation facility. Dr. Walchuk also said that his role as an emergency physician was to stabilize the patient medically and then get psychiatric clearance and that it was not within the scope of emergency medicine to arrange for substance abuse treatment.

¶ 15    Dr. Lam corroborated the testimony that the typical timeframe for observing an overdose patient was four to six hours and that Muhdi's records indicated that once she became medically stable, she remained so. Dr. Lam's examination of Muhdi at about 6 a.m. confirmed that her status had not changed and that she was medically cleared for discharge. Dr. Lam was aware that neither of the ACMC crisis evaluation nor the SASS evaluation indicated Muhdi required psychiatric placement. Dr. Lam testified that he could not determine or prepare Muhdi's discharge plan until he was advised of the SASS employee's conclusions and recommendations. Dr. Lam noted in Muhdi's record that she "declined detox," by which he meant that drug detox is a voluntary process and that she indicated to him she would not voluntarily go into detox. Dr. Lam testified that he did not have the ability to commit a patient to inpatient or outpatient drug treatment, even if that patient was a minor and a parent was saying they wanted the child to go into a detox program. Dr. Lam's note "discharge to home with outpatient psychiatric referral" meant that Muhdi would be discharged home with both a mental health and a substance abuse follow-up by SASS for outpatient care. Dr. Lam also

testified about some of the nurses' notes in Muhdi's record that had been made throughout her stay in the emergency department, such as the notes documenting that Muhdi had agreed to a social services evaluation; Muhdi had at times yelled, "I've been here so long; I just want to go home"; Muhdi pulled out her IV because she wanted to leave; her family was at the bedside; and SASS had given Muhdi outpatient treatment phone numbers and other information. At approximately 10 a.m. on January 19, 2014, Dr. Lam provided Muhdi and Biundo with discharge instructions that included them following up with drug abuse counseling and rehabilitation. Biundo executed and acknowledged her understanding of the discharge instructions. Dr. Lam testified that all of his care and treatment of Muhdi complied with the standard of care.

¶ 16    Biundo testified that when she arrived at the emergency room, she told the doctor and resident that she "wanted her [daughter] in observation," that she "thought observation was at least 24 hours," and that she later asked the ACMC social worker to transfer Muhdi to an inpatient rehabilitation center. She also testified that the SASS social worker told her that Muhdi "had to go to a mental ward." Muhdi stayed in the emergency room until 10 a.m. the next morning when Biundo signed Muhdi's discharge forms because Biundo's "eyes were, like, tired" and she thought that Muhdi was being admitted to the hospital. As soon as Biundo signed, Muhdi jumped up and left the room, and Biundo followed her out and did not object because she was "disoriented and tired." Biundo had been at the hospital the whole night and "was just confused." Upon leaving the hospital with her daughter, Biundo did not discuss or raise the issue of her daughter's drug use or near-fatal overdose, and Biundo had no plan for her daughter's next steps. Biundo drove her mother and daughter back to Burbank and then went to sleep on her mother's couch while her mother, brother, and daughter went to sleep in the bedrooms. In the early afternoon, her brother woke her to tell that Muhdi "just snuck out," ran to the corner, and got into a car. After being told, Biundo, however, went back to sleep with the expectation that Muhdi would keep in touch with her grandmother. When Biundo woke up a few hours later, she took a shower and went to a sports bar with her boyfriend. Around 7 p.m. or 8 p.m., Muhdi called or texted her mother to say that her cell phone battery was dying and that she was out with a friend. Muhdi did not say where she was or who she was with. Biundo did not leave the bar to pick up or look for Muhdi because Biundo "didn't know where she was at." Instead, Biundo returned to her table to finish her food and drinks, talk a bit, and watch a game. Biundo stayed at the sports bar until 11 p.m. or 11:30 p.m., and while on the way home, she called her mother and learned that Muhdi was still out. Biundo went to the Burbank Police Department to file a missing person report. Biundo told the police officer that Muhdi had stayed out all night before and frequently came home late. Biundo went back to her mother's house to sleep until approximately 7 a.m., when she saw her brother and mother going out to look for Muhdi, so Biundo picked up her boyfriend and also went out to look for Muhdi. Biundo got a call from Muhdi's half-brother who said that a deceased female had been found in a Bridgeview, Illinois, motel room. The female was later identified as Muhdi, and the cause of death was determined to be an overdose of heroin. The next day would have been Muhdi's eighteenth birthday.

¶ 17    After hearing from these and other witnesses, the jury returned a verdict against Biundo's claim, and on May 8, 2019, the trial judge entered judgment on the verdict in favor of Drs. Bolton, Permar (the physicians who revived Muhdi), and Lam (the physician who discharged

Muhdi), ACMC, and the other defendant, Advocate Health and Hospitals Corporation. On August 29, 2019, the trial judge denied Biundo's postjudgment motion.

¶ 18   The above summary is limited to the testimony and procedural facts necessary to understand the case, and we will set out additional details when needed to address the appellate arguments.

¶ 19   We first address Biundo's argument regarding the defendants' motion *in limine* No. 27 regarding the scope of testimony from Biundo's emergency room expert, Eugene E. Saltzberg, M.D. We reject the defendants' contention that Biundo waived this first argument by failing to make an offer of proof during the trial. Generally, when a trial court refuses evidence, the ruling is not appealable unless a formal offer of proof has been made. *Sullivan-Coughlin v. Palos Country Club, Inc.*, 349 Ill. App. 3d 553, 561, 812 N.E.2d 496, 503-04 (2004). The purpose of an offer of proof is to inform the trial court, opposing counsel, and a court of review of the nature and substance of the evidence sought to be introduced. *Volvo of America Corp. v. Gibson*, 83 Ill. App. 3d 487, 491, 404 N.E.2d 406, 409 (1980). Thus, a formal offer of proof regarding the testimony of witness as to a certain matter is not required when it is apparent that the trial court clearly understood the nature and character of the evidence sought to be introduced. *Volvo*, 83 Ill. App. 3d at 491; *Torres v. Midwest Development Co.*, 383 Ill. App. 3d 20, 26, 889 N.E.2d 654, 661 (2008). The record in this instance shows that the trial judge was given Biundo's written Rule 213(f)(3) disclosure of Dr. Saltzberg's opinions and pertinent deposition testimony and that the trial judge reserved ruling on motion *in limine* No. 27 in order to familiarize himself with that material. See Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 1996) (requiring a party to disclose the identity and other information regarding controlled expert witnesses). The trial judge also heard extensive arguments about Dr. Saltzberg's qualifications and opinions and whether an emergency department doctor should be allowed to testify that an in-person psychiatric evaluation was necessary. The report of proceedings indicates that the attorneys' arguments were detailed and that counsel specified what answers Dr. Saltzberg would give if allowed to testify as Biundo intended. Thus, the trial court clearly understood the nature and character of the proposed testimony and review of the issue has not been waived. *Torres*, 383 Ill. App. 3d at 27.

¶ 20   A trial court's ruling on a motion *in limine* addressing the admission of evidence will not be disturbed on appeal absent a clear abuse of the court's discretion. *Jones v. Rallos*, 384 Ill. App. 3d 73, 89, 890 N.E.2d 1190, 1205 (2008). An abuse of discretion occurs when the trial judge has acted arbitrarily or did not employ conscientious judgment, the ruling exceeded the bounds of reason and ignored recognized principles of law, or no reasonable person would take the same view. *Payne v. Hall*, 2013 IL App (1st) 113519, ¶ 12, 987 N.E.2d 447; *Sbarboro v. Vollala*, 392 Ill. App. 3d 1040, 1055, 911 N.E.2d 553, 566 (2009).

¶ 21   In order to prove a *prima facie* case of medical malpractice, the plaintiff has the burden of proof as to the proper standard of care against which the defendant professional's conduct must be measured. *Saxton v. Toole*, 240 Ill. App. 3d 204, 210, 608 N.E.2d 233, 238 (1992); *Purtill v. Hess*, 111 Ill. 2d 229, 241-42, 489 N.E.2d 867, 872 (1986). The plaintiff also bears the burden of proving an unskilled or negligent failure to comply with the appropriate standard of care by the defendant professional and a resulting injury proximately caused by the defendant professional's failure of skill or care. *Saxton*, 240 Ill. App. 3d at 210; *Purtill*, 111 Ill. 2d at 241-42. Because jurors are not skilled in the practice of medicine, expert medical testimony is

required to establish all three elements. *Saxton*, 240 Ill. App. 3d at 210; *Purtill*, 111 Ill. 2d at 242.

¶ 22    In her Rule 213 disclosures, Biundo disclosed Dr. Saltzberg to offer the following opinion: "Defendants deviated from the applicable standard of care by discharging Zenah Muhdi with a recommendation for outpatient follow-up care and without first having Zenah Muhdi undergo a psychiatric evaluation. Dr. Saltzberg will testify that it is his opinion that the standard of care required Defendants to refrain from discharging Zenah Muhdi until such time as inpatient psychiatric or substance abuse treatment could be procured."

¶ 23    However, the medical records and deposition testimony indicated that ACMC's director of psychiatry, Dr. Rowles, had consulted on Muhdi's case. That is, Dr. Bolton and Dr. Permar requested that Muhdi undergo a crisis evaluation; the licensed clinical social worker reviewed Muhdi's ACMC medical history and met with Muhdi and her mother in order to evaluate Muhdi; and the licensed clinical social worker then consulted by phone with ACMC's director of psychiatry, Dr. Rowles, and consulted in person with Muhdi's attending emergency medicine physician on the overnight shift, Dr. Hayward. The psychiatrist, Dr. Rowles, did not request or order a face-to-face psychiatrist's evaluation with Muhdi but rather decided that the licensed clinical social worker should next have Muhdi assessed by SASS to determine what services were available to Muhdi. The licensed clinical social worker also followed up on Muhdi's statement that she was no longer seeing her Rosecrance therapist, but Rosecrance also told the social worker that Muhdi needed to be evaluated by SASS for purposes of determining her eligibility for treatment. SASS was contacted and evaluated Muhdi in person. SASS's licensed master social worker confirmed that Muhdi did not meet the criteria for psychiatric hospitalization and that Muhdi should continue outpatient treatment at Rosecrance with follow-up services from SASS.

¶ 24    When Dr. Saltzberg was advised during his deposition that psychiatrist Dr. Rowles had, in fact, consulted on Muhdi's case, Dr. Saltzberg altered his opinion to be that the standard of care required the psychiatrist to see Muhdi in person. He stated:

"I'm not going to accept a telephone conversation between *** a social worker and a psychiatrist.

The standard of care is for the psychiatrist to see the patient. Either they come in and see the patient and then they can make the decision to discharge the patient or we transfer the patient to the psychiatric facility.

* * *

I'm saying she was psychiatrically unstable when she was discharged from [the hospital]. And that she should have been seen by a psychiatrist before they could make the decision to let her go. Not a conversation between a social worker and a psychiatrist. An actual physical evaluation."

¶ 25    In motion *in limine* No. 27, the defense asked to bar Dr. Saltzberg from opining that the standard of care required the ACMC psychiatrist to personally see Muhdi. The defendants argued that, as an emergency department physician, Dr. Saltzberg (1) lacked the expertise to speak to whether the ACMC psychiatrist should have personally seen Muhdi and (2) any such testimony or opinion from Dr. Saltzberg was not relevant as it lacked proximate cause.

¶ 26    Biundo contends the trial court barred the proposed testimony in the belief that Dr. Saltzberg would opine as to the psychiatric standard of care for evaluating a patient. She

contends Dr. Saltzberg intended to testify regarding the conduct of an emergency room physician, not a psychiatrist. She cites the principle that a plaintiff's medical expert need not specialize in the same area of medicine as the defendant doctor in order for the expert to qualify to speak to the appropriate standard of care. *Gill v. Foster*, 157 Ill. 2d 304, 316, 626 N.E.2d 190, 196 (1993). Expert testimony is admissible if the proffered expert is qualified as an expert by knowledge, skill, experience, training, or education and the testimony will assist the trier of fact in understanding the evidence. *Reed v. Jackson Park Hospital Foundation*, 325 Ill. App. 3d 835, 842, 758 N.E.2d 868, 874 (2001); see 735 ILCS 5/8-2501 (West 2014) (civil procedure statute regarding expert witnesses). Illinois law provides that when determining if a witness qualifies as an expert, the court shall apply standards, including, "[w]hether the witness has devoted a substantial portion of his or her time to the practice of medicine, teaching or University based research in relation to the medical care and type of treatment at issue which gave rise to the medical problem of which the plaintiff complains." 735 ILCS 5/8-2501(b) (West 2014). The trial court is to consider the precise testimony that is proposed and determine whether the witness qualifies as an expert in the kind of treatment criticized. *Silverstein v. Brander*, 317 Ill. App. 3d 1000, 1007, 740 N.E.2d 357, 362 (2000).

¶ 27    The record indicates that Dr. Saltzberg practiced in a hospital emergency room setting between 1980 and 2015, before he transitioned to practicing in urgent medical care, teaching at a medical school, and also providing expert witness opinions in medical malpractice cases. Dr. Saltzberg had no specialty within the addiction or substance abuse arena; had never published or made any presentations on drug overdoses, drug addiction, or substance abuse; and had no training in any type of psychiatry nor had his practice ever included counseling or evaluating patients from a psychiatric or psychological standpoint. Dr. Saltzberg's undergraduate degree in 1971 was in psychology, he did a medical residency in pediatrics, and he returned to school in 1979 to take a one-year intensive program in emergency medicine and later became board certified in emergency medicine. His most recent emergency department experience was as a staff physician between 2007 and 2015 at Lovell Federal Health Care Center (Lovell), where he provided care to veteran and active duty personnel in the region, including recruits participating in boot camp at Great Lakes Naval Base. Dr. Saltzberg testified that while at the Lovell facility, he saw overdose patients every day.

¶ 28    During his deposition, Dr. Saltzberg admitted that psychiatric evaluations are beyond what can be done by an emergency medicine physician, thus making clear that the standard of care for a psychiatrist is wholly independent from that of an emergency medicine physician. The defendants argued, *in limine*, that Biundo could not establish through Dr. Saltzberg that the three defendant emergency medicine physicians had been negligent by not ensuring that the psychiatrist personally conduct an evaluation. Biundo never named psychiatrist Dr. Rowles as a defendant, never deposed Dr. Rowles, and never claimed institutional negligence. Accordingly, Biundo had no basis, qualified testimony, or disclosed opinions to criticize the nature of Dr. Rowles's consultation of Muhdi.

¶ 29    Biundo's reliance on *Silverstein*, 317 Ill. App. 3d 1000, is misplaced. The plaintiff in that case suffered a new stomach ulcer while in a rehabilitation facility following hip replacement surgery, allegedly because he was continued on Indocin, despite a history of peptic ulcers and complaining that he was experiencing nausea. *Silverstein*, 317 Ill. App. 3d at 1002. Approximately a week after the hip replacement surgery, he had to undergo surgery to remedy the new ulcer. *Silverstein*, 317 Ill. App. 3d at 1002. The trial court ruled that the plaintiff's

- 10 -

medical expert, an internist, was unqualified to testify that the defendant, a physiatrist, had violated the standard of care in medically managing the plaintiff during his rehabilitation. *Silverstein*, 317 Ill. App. 3d at 1002. The appellate court reversed the trial court's ruling, first observing that the internist had criticized the physiatrist's medical management rather than the physiatrist's physical therapy. *Silverstein*, 317 Ill. App. 3d at 1007. The internist testified that he had worked on the medical management of more than 100 patients while they underwent physical rehabilitation following hip replacement surgery. *Silverstein*, 317 Ill. App. 3d at 1007. *Silverstein* is not on point. The plaintiff's expert in *Silverstein* provided an adequate foundation establishing the reliability of the information on which his opinions were based, specifically that he had medically managed more than 100 patients while they underwent rehabilitation following hip-replacement surgery. *Silverstein*, 317 Ill. App. 3d at 1007. Dr. Saltzberg did not testify that his training, background, education, or experience qualified him to testify to a psychiatrist's standard of care. Dr. Saltzberg was not qualified to establish the requirements for a psychiatrist and thus could not impugn any alleged failure by the psychiatrist on the defendants.

¶ 30    Even assuming *arguendo* that Dr. Saltzberg was qualified, his opinion lacked proximate cause and, therefore, was properly barred. During his discovery deposition, Dr. Saltzberg conceded that he could only speculate what a psychiatrist would have diagnosed or recommended for Muhdi had an in-person psychiatric evaluation been conducted. Biundo did not retain a psychiatrist to testify that an in-person evaluation of Muhdi would have resulted in Muhdi being admitted to a psychiatric facility or would have otherwise altered the course of events. In addition, Biundo's attorney acknowledged that Dr. Saltzberg would not offer any proximate cause testimony regarding an in-person psychiatric examination. Testimony grounded in guess, surmise, or conjecture is not regarded as proof of a fact and is irrelevant as it has no tendency to make the existence of a fact more or less probable. An expert opinion based upon the witness's guess, speculation, or conjecture as to what he or she believed might have happened is inadmissible. *Dyback v. Weber*, 114 Ill. 2d 232, 244-45, 500 N.E.2d 8, 13 (1986). "The proximate cause element of a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty." *Krivanec v. Abramowitz*, 366 Ill. App. 3d 350, 356-57, 851 N.E.2d 849, 854 (2006); *Freeman v. Crays*, 2018 IL App (2d) 170169, ¶¶ 20-36, 98 N.E.3d 571. Although Dr. Saltzberg testified that he had experience calling for psychiatric consults in an emergency department, the trial court properly determined that he was not qualified to offer an opinion regarding a psychiatrist's standard of care. It was not enough for Dr. Saltzberg to state that if the defendants had ensured that the psychiatrist, Dr. Rowles, complied with Dr. Saltzberg's claimed standard of care and conducted an in-person examination of Muhdi, that Dr. Rowles could have come to a diagnosis or recommendation that could have changed the outcome. Where Dr. Saltzberg could not testify to a reasonable degree of medical certainty as to what Dr. Rowles would have determined or recommended for Muhdi, he lacked the necessary foundation to offer an opinion that the defendants' alleged negligence of not ensuring that an in-person examination was conducted was the proximate cause of Muhdi's death.

¶ 31    Because Dr. Saltzberg was unqualified to speak to the standard of care for a psychiatrist and unable to address the element of proximate cause, the trial court did not abuse its discretion in granting motion *in limine* No. 27 to bar Dr. Saltzberg from opining that the standard of care required the ACMC psychiatrist to personally see Muhdi.

¶ 32    Biundo next argues that the trial court should not have granted the defendants' motion *in limine* No. 37 to bar Biundo from eliciting testimony that Muhdi was not medically cleared for discharge. Biundo contends the trial court misconstrued her expert's deposition testimony to equate "medically clear" with "medically stable" and that this unfairly prevented Biundo from eliciting testimony that Muhdi was not medically clear.

¶ 33    She also contends that a lack of medical stability was an "alternative theory of the case" that she also should have been permitted to explore during the trial in order to discredit the three physician defendants and two defense medical experts, who all testified that Muhdi was medically cleared.

¶ 34    For the reasons discussed above regarding motion *in limine* No. 27, we reject the defendants' contention that Biundo's failure to make an offer of proof has resulted in waiver of her argument regarding motion *in limine* No. 37. See *Torres*, 383 Ill. App. 3d at 27. Nevertheless, we do not find Biundo's argument regarding motion *in limine* No. 37 to be persuasive.

¶ 35    Biundo alleged in her complaint that Drs. Bolton, Permar, and Lam were negligent by "determining that the decedent was medically cleared and could be discharged from physician care." However, her Rule 213(f)(3) disclosures did not include any opinion that the defendants were negligent in determining that Muhdi was medically cleared for discharge. Then, at the pretrial hearing, when it was time to address motion *in limine* No. 37, the defendants read aloud a portion of Dr. Saltzberg's discovery deposition:

> "Q. Would you agree with me that when the decedent was discharged, she had been medically cleared?
>
> A. Yes.
>
> Q. Okay.
>
> A. In their opinion she was medically cleared.
>
> Q. Do you disagree from a medical standpoint that she should not have been medically cleared?
>
> A. *Well, I'm not sure about that.* There were some documentation of her—of her presentation that was documented that she was disheveled, that she had a distorted thought process. There were signs that she wasn't really medically cleared.
>
> Q. Doctor, what's your definition of medically cleared?
>
> A. Definition of medically cleared means the patient is in a stable condition in order to continue functioning. *Now where I question that is* when she was evaluated by the [licensed clinical social worker], she described her as disheveled, depressed, irritable. Having slurred speech, distorted thought process. *So if that was the case at the time she was discharged*, she wasn't really medically cleared." (Emphases added.)

¶ 36    The defendants pointed out that the timeframe that Dr. Saltzberg spoke of when Muhdi was evaluated by the ACMC crisis worker was 1 a.m., which was nine hours prior to Muhdi's discharge at 10 a.m. The defendants argued that any opinion by Dr. Saltzberg that Muhdi did not meet the criteria for medical clearance at the time of her discharge should be barred because it was not a disclosed opinion pursuant to Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 1996). Rule 213(f)(3) requires that upon written interrogatory, for each "controlled expert witness," a party must identify "(i) the subject matter on which the witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the

witness; and (iv) any reports prepared by the witness about the case." Ill. S. Ct. R. 213(f)(3) (eff. Jan. 1, 1996).

¶ 37 The *in limine* argument was based on the principles that "Rule 213 is mandatory and strict compliance is required." *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 938, 738 N.E.2d 199, 205 (2000). "Rule 213 is designed to give those involved in the trial process a degree of certainty and predictability that furthers the administration of justice and eliminates trial by 'ambush.' " *Copeland*, 316 Ill. App. 3d at 946 (quoting *Firstar Bank of Illinois v. Peirce*, 306 Ill. App. 3d 525, 535, 714 N.E.2d 116, 122 (1999)).

¶ 38 Our review of Biundo's Rule 213 response to the defendants indicates that she did not disclose the proposed opinion. In addition, Dr. Saltzberg's deposition statement, "I'm not sure about that," is an equivocal statement as to whether he held the opinion that Muhdi was not medically cleared when she was discharged. Dr. Saltzberg also expressed uncertainty about Muhdi's presentation when she was discharged when he framed his statement about her medical clearance with the conditional statements "Now where I question that is" and "So if that was the case at the time she was discharged." The transcript of the pretrial hearing indicates that the trial court accurately remarked that Dr. Saltzberg did not appear to know the facts of Muhdi's presentation at 10 a.m. when she was discharged and thus the expert could not have formed an opinion that Muhdi "wasn't really medically cleared" at 10 a.m.

¶ 39 During the pretrial hearing, the trial court also properly refuted counsel's attempt to distinguish Dr. Saltzberg's use of the term "clearance" from his use of the term "stability." Although Biundo's attorney suggested these were two different states, when Dr. Saltzberg testified at trial, he admitted that Muhdi was medically cleared and he used the two terms at issue interchangeably:

"Q. In your opinion what goes into determining medical *clearance*?

A. Purely medical *clearance* is evaluation of the vital signs and the *stability* of those vital signs over a period of time. To a patient like this patient a period of six to eight hours would be medical *stability*.

Q. And so based upon your criteria what you've just described, this patient was medically *clear* to be discharged?

A. She was medically *stable* at the time of her discharge, yes." (Emphases added.)

¶ 40 For these reasons, we are not persuaded that Biundo's case was unfairly prejudiced when the trial court barred Dr. Saltzberg from testifying that Muhdi was not medically cleared for discharge. Also, Biundo's contention that she was unfairly prevented from exploring a lack of medical stability as an "alternative theory of the case" that was distinct from her allegation of a lack of medical clearance is belied by her own expert's interchangeable use of the terms "stability" and "clearance." It was not an abuse of discretion to grant the defendants' motion *in limine* No. 37.

¶ 41 Biundo's last arguments are overlapping. She asks us to reverse the judgment or grant a new trial because the jury's verdict was contrary to the manifest weight of the evidence. She also contends the trial court should have granted her motion for a JNOV because the evidence so favored Biundo that no contrary verdict could stand or the trial court should have granted her motion for a new trial because the jury's verdict was contrary to the manifest weight of the evidence.

¶ 42 With regard to the first argument, "It is well established that, in an appeal from a jury verdict, a reviewing court may not simply reweigh the evidence and substitute its judgment for that of the jury." *Snelson v. Kamm*, 204 Ill. 2d 1, 35, 787 N.E.2d 796, 815 (2003). Reversal is permissible only when the verdict is contrary to the manifest weight of the evidence adduced. *Snelson*, 204 Ill. 2d at 35. "A verdict is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings of the jury are unreasonable, arbitrary, and not based upon any of the evidence." *Snelson*, 204 Ill. 2d at 35.

¶ 43 Biundo contends the combination of the defendant doctors' awareness of Muhdi's substance abuse and her "premonition of death" when she told Dr. Permar she had told her friends "the next time I use I might die" is overwhelming evidence that the physicians deviated from the standard of care for emergency department physicians. She contends the standard of care required that Muhdi be admitted to the hospital until she could be transferred to an inpatient facility rather than being discharged into the same environment that resulted in her overdose.

¶ 44 Biundo, however, relies almost solely on the testimony of her own expert, Dr. Saltzberg, to establish the standard of care. During the trial, Dr. Saltzberg testified that the standard of care for an emergency room physician in treating a heroin overdose required that the patient be admitted to the hospital until inpatient substance abuse treatment could be procured. A minor patient in particular would need to be assessed by social services and then be admitted to the hospital. Muhdi's "premonition of death" required more aggressive treatment. The hospital did not have inpatient substance abuse treatment on its premises, and the standard of care did not require it to offer that service. However, under these circumstances, the standard of care required Muhdi to be admitted to the hospital until inpatient substance abuse treatment could be arranged. Dr. Saltzberg further opined that the care Muhdi received deviated from this standard of care and put her back into the same environment in which she had overdosed on heroin. Dr. Saltzberg did not agree with the treatment plan devised by Drs. Bolton and Permar of medically clearing Muhdi and having the ACMC crisis worker and SASS social worker evaluate her psychiatric state. This created an expectancy of Muhdi's discharge, which allowed her to "slip through the cracks" between the changing shifts of the emergency room physicians. In Dr. Saltzberg's opinion, Muhdi should have been evaluated by social services and then been admitted to the hospital. With regard to Dr. Lam, Dr. Saltzberg testified that he breached the standard of care when he ultimately discharged Muhdi into the same environment she had come from.

¶ 45 Absent from Biundo's argument regarding the jury's verdict is any analysis of the testimony of the three defendant physicians, each of whom was questioned about the standard of care and whether they breached that standard. Biundo also fails to address the impact of the testimony of two defense experts not summarized above.

¶ 46 One of those defense experts was Andrea Grubb Barthwell, M.D., who specializes in the treatment of opioid use disorders. Dr. Barthwell is a board-certified addiction medicine specialist, who had extensive experience treating opioid dependence, including working as the medical director for the largest treatment system for adolescents in the country, their methadone maintenance treatment programs, and their residential programs with therapeutic communities. She went on to found an intensive addiction treatment program in the Outer Banks of North Carolina. Dr. Barthwell has advised two presidential administrations about substance abuse prevention, intervention, and treatment; was a board member of a national

association for the treatment of opioid disorders; publishes extensively; lectures to other physicians frequently on addiction medicine; and is a consultant for emergency room physicians. In addition, Dr. Barthwell maintains a private addiction treatment practice in Oak Park, Illinois.

¶ 47      Dr. Barthwell indicated that with substance abuse disorder, the emergency department will assess and stabilize an acute condition and then return the patient to the community for treatment of the underlying chronic disorder. Dr. Barthwell testified that from her perspective as an addiction specialist, an "18-hour stretch was an unusual[ly] long period to be maintained in the emergency room following [the] reversal [of an overdose]." Also, never in her experience had someone been "held in the emergency room and transferred directly into [her] inpatient program [in North Carolina]." Patients are "either admitted to the hospital because they require more medical stabilization or they [are] discharged to the care of their loved ones and their loved ones have [them] transferred [to intensive substance abuse treatment]."

¶ 48      Dr. Barthwell disagreed with Dr. Saltzberg's testimony that inpatient psychiatric care and inpatient drug treatment are the same thing and said those two systems take a diametrically different approach to treatment. When individuals with a substance abuse disorder are misplaced into a psychiatric environment, many of them will experience an exacerbation of their symptoms. Florida is the only state that provides for the involuntary commitment of someone into substance abuse treatment.

¶ 49      The defendants' other expert witness was Dr. Mark E. Cichon, chair of the department of emergency medicine at Loyola University Medical Center, who disagreed with Dr. Saltzberg's opinion that Muhdi "fell through the cracks" after Drs. Bolton and Permar reversed the overdose. Dr. Cichon further testified, "In the hospital setting, she was well cared for, and it's my opinion they more than met the standard of care." He also disagreed with Dr. Saltzberg's opinion that Muhdi should have been held in the emergency department indefinitely until inpatient substance abuse treatment could be arranged or she was transferred to an inpatient drug treatment program. Dr. Cichon corroborated the testimony that there had to be a medical or psychiatric reason to hold someone. He spoke to the issue of Muhdi's "risk of harm to herself" and explained that although individuals engage in various dangerous behaviors, that conduct does not render them subject to a psychiatric admission. Dr. Cichon specifically disagreed with Dr. Saltzberg's testimony that Muhdi's death was foreseeable and testified that the treating physicians had no indication or reason to believe that Muhdi would "run off" while in her mother's care nor would they have any reason to believe that the mother would not supervise her daughter once she was discharged into her care. Dr. Cichon also told the jury that nothing the doctors did or failed to do caused Muhdi's death. Rather, Muhdi's death was caused by her use of heroin and an overdose of heroin.

¶ 50      Biundo's argument that the doctors' knowledge of Muhdi's history with drugs and drug rehab placed them on "notice" that she required "more significant intervention" is not supported by the record. No evidence or testimony even suggests that any of the doctors were told or had knowledge that the report of "failed rehab" was actually Biundo's removal of Muhdi from the Aspiro program against medical advice. Similarly, no testimony or evidence exists indicating that any of the doctors were told that Biundo, despite being told that her daughter required ongoing weekly therapy upon her premature departure from Aspiro, failed to ensure that her daughter received the therapy necessary to support her sobriety. None of the doctors knew that Biundo had regularly returned Muhdi to the same environment in Burbank

with the same friends and influences that Biundo knew to be dangerous for her daughter. The doctors also had no reason to know that Biundo would fail to supervise and monitor Muhdi upon discharge from the emergency department. The jury was able to consider Biundo's role in the overdose and that Dr. Saltzberg's criticism that Muhdi had been discharged "into the exact same environment" was actually a criticism that Muhdi had been discharged "back to the care of her mother."

¶ 51       Dr. Saltzberg's testimony that Muhdi made a "premonition of death" was addressed by Dr. Barthwell, who disagreed with the opinion and indicated Muhdi's statement was actually a positive sign that she was beginning to recognize that her drug use was risky. This recognition occurred after Muhdi spent time in the Aspiro program. Muhdi made the statement and also denied that she was trying to harm herself. The Aspiro records showed that Muhdi had attended therapy with Lowe and other therapists, and Dr. Barthwell opined from those records that Muhdi made "[t]remendous progress" in the program. Dr. Barthwell testified, "the whole point of substance use treatment is to allow the patient to develop an insight recognizing that a problem exists and then pairing that insight with the motivation to take an action to a resolve that problem."

¶ 52       Biundo's argument based almost entirely on Dr. Saltzberg's testimony regarding the standard of care does not persuasively show that the jury's verdict was contrary to the manifest weight of the evidence.

> "Neither the trial judge nor the reviewing court should sit as a second jury to consider the nuances of the evidence or the demeanor and credibility of the witnesses. Rather their function is to act as a check upon possible excesses of the jury to correct substantial injustices which might result." *Stringer v. McHugh*, 31 Ill. App. 3d 720, 723, 334 N.E.2d 311, 313 (1975).

"It is the province of the jury to resolve conflicts in the evidence, to pass upon the credibility of the witnesses, and to decide the weight to be given to the witnesses' testimony." *Larkin v. George*, 2016 IL App (1st) 152209, ¶ 19, 65 N.E.3d 1002. Here, each side presented evidence which, if believed by the jury, would support a verdict in its favor. We cannot say that the jury's apparent conclusion regarding the standard of care is "unreasonable, arbitrary, and not based upon any of the evidence," nor can we find that "the opposite conclusion is clearly evident" *Snelson*, 204 Ill. 2d at 35. In light of the record regarding the standard of care, we need not address Biundo's contention that deviation from a standard of care was the proximate cause of Muhdi's death. The record clearly supports the jury verdict in favor of the defendants.

¶ 53       Accordingly, we reject Biundo's contention that we should either reverse the verdict or order a new trial.

¶ 54       Biundo's last two arguments concern her posttrial motion in which she sought a JNOV or alternatively a new trial.

¶ 55       "An appellate court reviews *de novo* a trial court's decision to grant or deny a motion for [JNOV] but, like the trial court, must be careful not to ' "usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." ' " *Jones v. Chicago Osteopathic Hospital*, 316 Ill. App. 3d 1121, 1125, 738 N.E.2d 542, 547 (2000) (quoting *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132, 720 N.E.2d 242 (1999), quoting *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53, 603 N.E.2d 508 (1992)).

¶ 56    The JNOV standard is even more challenging than the manifest-weight-of-the-evidence standard, which we have already determined Biundo did not meet.

> "A [JNOV] is properly entered in those limited cases where 'all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand.' [*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 514 (1967).] In ruling on a motion for a [JNOV], a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion. [Citations.] Most importantly, a [JNOV] may not be granted merely because a verdict is against the manifest weight of the evidence. [Citation.]" *Maple*, 151 Ill. 2d at 453.

¶ 57    The standard for obtaining a JNOV is " 'a very difficult' " one to meet, limiting the trial court to " 'extreme situations only.' " *Jones*, 316 Ill. App. 3d at 1125.

¶ 58    No trial court or reviewing court may enter a JNOV "if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Maple*, 151 Ill. 2d at 454. A JNOV is inappropriate if "reasonable minds might differ as to inferences or conclusions to be drawn from the facts presented." *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 351, 654 N.E.2d 1365, 1374 (1995). This is what occurred in the present case. There was conflicting expert testimony about the standard of care and proximate cause, and reasonable minds could differ as to the conclusions to be drawn from that evidence. We cannot say that the evidence overwhelmingly favored Biundo's claim. Accordingly, we conclude that the trial court did not err in denying Biundo's posttrial motion for a JNOV.

¶ 59    In her posttrial motion, Biundo argued in the alternative that a new trial was warranted because the verdict was contrary to the manifest weight of the evidence. Whether to grant a new trial based on a determination that the jury's verdict was against manifest weight of evidence is a matter addressed to the sound discretion of the trial court, and the court's ruling on a motion for a new trial will not be reversed unless it is affirmatively shown that the trial court clearly abused its discretion. *Maple*, 151 Ill. 2d at 455. Here, Biundo reiterates her argument that "the standard of care established by Dr. Saltzberg required that [Muhdi] be admitted to the hospital in a medically controlled environment until an inpatient substance abuse treatment could be procured. This was particularly necessary based on [Muhdi's] premonition of death." She argues, "There is no evidentiary basis on which the jury made their verdict." Towards the end of her brief, Biundo contends, "Even if this Court finds that the higher burden is not met as a result of the trial court erroneous denial of the motion for [JNOV], Biundo's posttrial motion for a new trial on all issues *or on the issue of damages* should have been granted." (Emphasis added.) Biundo, however, has not made an argument that is specifically about damages. To the contrary, her brief suggests that damages went uncontested and need not be addressed on appeal. That is, she argues: "Biundo established that she suffered harm from the Defendants' negligence through her loss of companionship with her daughter and the expenses related to [the] funeral and burial. [Citation.] *Defendants presented no evidence at trial that negated this element. The only issues in this case are* whether Dr. Bolton, Dr. Permar, Dr. Lam, and Christ Hospital deviated from their *standard of care* and whether the death of Zenah was the *proximate cause* of the Defendants' deviation from that standard

of care." (Emphases added.) Accordingly, we decline to analyze the element of damages as a distinct issue. We are not persuaded by Biundo's argument focusing on Dr. Saltzberg that the jury disregarded the manifest weight of the trial evidence. We find, therefore, that the trial court did not abuse its discretion in denying Biundo's postjudgment motion for a new trial.

¶ 60    In summary, Biundo has challenged two of the trial court's evidentiary rulings, sought our grant of a reversal or new trial, and argued that the trial court erred or abused its discretion by denying Biundo's posttrial motion for a JNOV or new trial. However, having considered the record, the appellate briefs, and the relevant law, we have rejected all of her arguments. Accordingly, we affirm the trial court's judgment.

¶ 61    Affirmed.