2024 IL App (1st) 230918-U

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

FIRST DIVISION
June 24, 2024

No. 1-23-0918

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| LOLITA McCALEY, Independent Administrator of the Estate of Marshana McCaley, Deceased, | ) ) ) | |
| | ) | Appeal from the |
| Plaintiff-Appellant, | ) | Circuit Court of |
| | ) | Cook County |
| v. | ) | |
| | ) | No. 18 L 5925 |
| POLINA PETROVIC, M.D., ADVOCATE HEALTH | ) | |
| AND HOSPITALS CORPORATION, a corporation d/b/a | ) | The Honorable |
| Advocate Trinity Hospital, and CHICAGO IMAGING, | ) | Maura Slattery Boyle, |
| LTD., a corporation, | ) | Judge Presiding. |
| | ) | |
| Defendants-Appellees. | ) | |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Lavin and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held:*  As to two defendants, the jury verdict is vacated and the case remanded for new trial based on the trial court's error in barring the plaintiff from disclosing and presenting proper rebuttal evidence. The verdict and judgment are affirmed as to a third defendant, based on the jury's answer to a special interrogatory on apparent agency.

¶ 2    This is a medical negligence case by the plaintiff, Lolita McCaley, Independent Administrator of the Estate of Marshana McCaley, Deceased, against the defendants, Polina Petrovic, M.D., her medical practice group Chicago Imaging, Ltd., and Advocate Health and

Hospitals Corporation d/b/a Advocate Trinity Hospital (hereinafter Advocate or Trinity Hospital).

Following trial, a Cook County jury rendered a verdict in favor of all defendants. On appeal, the

plaintiff's principal argument is that she is entitled to a new trial due to the trial court's error in

barring her from presenting rebuttal evidence after the defendants raised a new theory of medical

causation in the case. For the reasons that follow, we reverse and remand this case for a new trial

as to defendants Petrovic and Chicago Imaging. However, we affirm the verdict and judgment as

to Advocate based on the jury's special interrogatory finding that defendant Petrovic was not its

apparent agent.

¶ 3                                    I. BACKGROUND

¶ 4        On September 16, 2016, Marshana McCaley, age 17, underwent a tonsillectomy. Twelve

days later, on September 28, 2016, she presented at the emergency department of Trinity Hospital,

complaining of right leg and buttock pain for the preceding few days. She was evaluated by a

physician assistant, Bridget LeClair, who ordered a venous Doppler ultrasound of her right leg to

rule out the possibility that she was experiencing a blood clot or deep vein thrombosis (DVT).

Defendant Petrovic was the radiologist who read and interpreted the images from that ultrasound,

and she reported the ultrasound as normal. Marshana was discharged with a diagnosis likely for

muscle strain. Two days later, on September 30, 2016, Marshana's foster mother found her

unconscious and without a pulse. Paramedics arrived and were able to resuscitate her after 40

minutes. She was taken by ambulance to Trinity Hospital and then transferred to Christ Hospital.

She never regained consciousness, and she died on October 2, 2016.

¶ 5                                 A. Pretrial Proceedings

¶ 6        On June 7, 2018, the plaintiff filed the present wrongful death and survival action. From the

outset of the case, the plaintiff's theory was that Marshana had died of a pulmonary embolism

caused by a blood clot in her pelvic area that went undiagnosed as a result of defendant Petrovic's negligent misreading of the ultrasound of her right leg on September 28, 2016. More specifically, the principal allegation of negligence was that defendant Petrovic failed to interpret the absence of respiratory variation seen in the flow patterns of the veins of the leg as highly suggestive of a blood clot closer to the heart; this finding, together with Marshana's symptoms, should have warranted evaluation of the veins closer to the heart. The health care provider's report attached to the initial complaint states that without this breach of the standard of care, Marshana likely would have been treated, "not developed a pulmonary embolism and would have survived."

¶ 7    Discovery proceeded, and on July 31, 2020, the motion judge presiding over the case entered a case management order setting December 1, 2020, as the date for both the plaintiff and the defendants to simultaneously disclose their controlled expert witnesses under Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2018). That order further set a deadline for experts' depositions of February 1, 2021. The only future court date set forth in that order was case management for trial certification on April 1, 2021. The plaintiff's attorney later agreed to an extension until January 15, 2021, for the defendants to make their expert witness disclosures.

¶ 8    In multiple disclosures, the last one dated November 30, 2020, the plaintiff's attorney disclosed seven controlled expert witnesses. Two of those witnesses (Arnold Friedman, M.D., and Leslie Millar-Scoutt, M.D.) were disclosed to offer opinions on the standard of care. A third witness, Paul E. Collier, M.D., a vascular surgeon, was disclosed to offer opinions on both the standard of care and causation. Dr. Collier's causation opinion was that Marshana died as a result of a pulmonary embolism. A fourth witness, surgical pathologist Michael W. Kaufman, M.D., was disclosed to offer opinions on causation. In pertinent part, the disclosure of Dr. Kaufman stated that he was offered to testify to the following opinions and conclusions:

"The cause of the death of Marshana McCaley was the blood clot that was undetected on 9/28/16. Dr. Kaufman will further provide testimony about the timing of the clot and how he is able to opine that it was the blood clot that caused her death."

The plaintiff's final three controlled expert witnesses were nonmedical witnesses, the only one pertinent to this appeal being Donna Schuurman, Ed.D., an expert on the topic of grief disclosed to serve as a damages witness.

¶ 9      On January 15, 2021, the defendants disclosed seven controlled expert witnesses. The witness most pertinent to the issues raised on appeal was Dan Fintel, M.D., a board-certified cardiologist disclosed to offer opinions on causation. In pertinent part, the disclosure of Dr. Fintel stated that he would offer the following opinions and conclusions:

"3. Dr. Fintel will testify that the most likely cause of [Marshana McCaley's] cardiopulmonary arrest and collapse on September 30, 2016 was an acute myocardial infarction in the setting of hypertrophic cardiomyopathy. This myocardial infarction was unforeseeable and not diagnosed prior to autopsy.

4. There is no evidence to suggest a massive pulmonary embolism caused the cardiopulmonary arrest on September 30, 2016. [Marshana McCaley's] clinical presentation, laboratory results, and imaging studies, including but not limited to, the blood gasses obtained after resuscitation, the lack of right ventricle enlargement on the echocardiogram dated 10/1/16 at 9:43 a.m., the low BNP [(brain natriuretic peptide)] following resuscitation, and the abnormal EKG findings suggest a cardiac cause of the collapse on September 30, 2016 is more likely than a pulmonary cause."

¶ 10      Discovery depositions proceeded of the 14 disclosed expert witnesses. The deposition of Dr. Fintel was taken on April 7, 2021. During that deposition, Dr. Fintel testified that Marshana's

death was not caused by a blood clot resulting in pulmonary embolism, but rather it was caused by a preexisting cardiac condition of hypertrophic cardiomyopathy that led to a heart attack. He stated:

"[M]y basic opinion is that there is no conclusive evidence to support the conclusion that Ms. McCaley died as a consequence of venous thromboembolic disease or, simply put, a blood clot that left her venous circulation and caused sufficient obstruction of blood flow in the heart that she developed cardiopulmonary arrest. I do not believe that to be the case.

I believe the data that we have available conclusively demonstrates that in the setting of her left ventricular hypertrophy, with ventricular walls of 2.4 centimeters or more on a CAT scan and a postmortem exam, the finding of an abnormal EKG *** that shows findings of an acute transmural myocardial infarction, the finding of an elevated troponin, the pathological findings *** of an early-evolving myocardial infarction, that it was that disease process that caused her to have a loss of consciousness, generally due to an arrhythmia, from which she was successfully resuscitated, although, she sustained such severe brain damage that she passed away on October 2nd on the second and a half hospital day at Christ.

So in summary, I believe this was a cardiac death, which is why I'm here today, and was not a foreseeable and preventable event."

¶ 11 On May 26, 2021, the plaintiff filed a motion requesting that the motion judge schedule a case management conference and "for entry of an order scheduling a cut-off date for rebuttal witnesses to be disclosed and deposed." By e-mail, the defendants objected to the disclosure of rebuttal witnesses.

¶ 12 On June 2, 2021, the motion judge sent an e-mail to all counsel, stating that there was no need

for a case management conference and to draft an agreed order. The court's e-mail further stated, "And there is no rebuttal. I assume that the [Rule 213(f)(3) interrogatories] have been answered? If so, and there is a need to supplement one side's disclosures, based on the opposing party's disclosures, then do so." On June 4, 2021, the trial court entered an order that stated as follows: "Rebuttal witnesses are not allowed. The parties are given until July 1, 2021 to supplement their respective Rule 213(f)(3) disclosures. Trial certification in this matter is set for July 8, 2021."

¶ 13    On June 25, 2021, the plaintiff served supplemental interrogatory answers disclosing a new expert witness, Aaron B. Waxman, M.D., Ph.D., a pulmonary and critical care physician who is the executive director of the Center for Pulmonary and Heart Disease at Brigham and Women's Hospital in Boston and an associate professor of medicine at Harvard Medical School. Dr. Waxman provided a four-page report. Its contents are set forth in greater detail in the analysis below, but it essentially explained why certain cardiac evidence obtained from the CT imaging and autopsy findings allowed cardiomyopathy or other cardiac disease to be ruled out and supported the theory that pulmonary embolism was the inciting cause of the physiologic process that led to death. The summary opinion stated:

> "It is very clear from the record that the cause of death was pulmonary embolism. Based on clinical findings and the autopsy, there is no evidence of coronary disease, myocardial ischemia, or cardiomyopathy. This patient has no other culprit lesions or risk factors for her untimely death other than pulmonary embolism."

The plaintiff's supplemental disclosures stated also that Dr. Kaufman and Dr. Collier had reviewed the report authored by Dr. Waxman and agreed with its conclusions that the cause of death was pulmonary embolism.

¶ 14    On July 2, 2021, the defendants filed a motion to strike the plaintiff's supplemental expert

witness disclosures. They argued that the plaintiff's disclosure of Dr. Waxman was "in direct violation of this court's ruling denying the request to name a rebuttal witness."

¶ 15    On July 8, 2021, the plaintiff filed a response stating that Dr. Fintel had disclosed an opinion that the cause of death in this case was acute myocardial infarction in the setting of hypertrophic cardiomyopathy, and he had elaborated in this opinion in his deposition on April 7, 2021. The response argued that it was appropriate for the plaintiff to disclose a new expert in situations where such testimony was necessary to rebut a new affirmative defense raised by defendants, and it would be unjust and prejudicial if the plaintiff was not given the chance to present an expert witness "on the topic of cardiology, which has clearly become a significant argument for Defendant."

¶ 16    On July 9, 2021, the motion judge entered an order granting the defendants' motion to strike. By that order, the court struck the plaintiff's supplemental expert witness disclosures, barred Dr. Waxman from testifying at trial, and prohibited any of the plaintiff's previously disclosed expert witnesses from relying on Dr. Waxman's report. On July 12, 2021, the motion judge entered an order certifying the case for trial and placing the case on the trial-certification calendar.

¶ 17    On July 27, 2021, the plaintiff filed a motion for reconsideration of the orders striking the plaintiff's supplemental expert witness disclosures. In this motion, the plaintiff elaborated as to how Dr. Fintel's causation opinion had injected a new issue into the case which the plaintiff lacked testimony to rebut. The plaintiff argued that defendants would suffer no prejudice because jury trials were just beginning to recommence after pausing during the COVID-19 pandemic. The plaintiff additionally argued that Dr. Waxman's report was factual material that Dr. Kaufman and Dr. Collier could rely upon as a basis for their opinions under principles of *Wilson v. Clark*, 84 Ill. 2d 186 (1981), and the trial court should reconsider that aspect of its order also. On August 3, 2021, the motion judge entered an order denying the plaintiff's motion for reconsideration.

¶ 18        On November 10, 2021, the case appeared on the trial-setting call where it was set for trial beginning October 24, 2022.

¶ 19        On October 25, 2022, the plaintiff presented a motion to the assigned trial judge requesting reconsideration of the motion judge's rulings concerning rebuttal testimony by Dr. Waxman and the ability of the plaintiff's other disclosed experts to rely upon his report. In oral argument on the motion, the plaintiff's attorney argued that the motion judge's blanket refusal to allow rebuttal witnesses had been error, because the injection of a new, unanticipated causation opinion by one of the defendants' expert witnesses made this an appropriate case for the plaintiff to present testimony in rebuttal.

¶ 20        In response, the attorney for defendant Petrovic argued that it was inappropriate to reconsider an issue that the motion judge had already addressed twice, and the plaintiff should have attempted interlocutory review of the ruling in the appellate court through a finding under Supreme Court Rule 304(a) (eff. Mar. 8, 2016). Counsel further argued that "[a]t all times Plaintiff's obligated not only to advance the theory [of causation] but to be prepared for alternative theories" that defendants may present; he argued that the plaintiff's pathologist, Dr. Kaufman, had introduced the possibility that Marshana had suffered a heart attack, so the information regarding an alternative cause of death was in the plaintiff's possession before it was in possession of the defense. Finally, counsel argued that granting the plaintiff's motion to reconsider would require substantial additional discovery that would delay trial.

¶ 21        Counsel for defendant Chicago Imaging argued that it was inappropriate to wait until all expert depositions were completed before seeking to name a rebuttal witness, and the plaintiff should have done so after receiving the defendants' disclosures and before any depositions had been taken. Finally, counsel for Advocate argued that the plaintiff should have brought a second

motion to reconsider before the motion judge and that it was improper to wait to raise the issue before the trial judge on the day of trial.

¶ 22 The trial judge denied the plaintiff's motion for reconsideration concerning rebuttal testimony. The trial judge reasoned that the motion judge had ruled on the issue and also entertained a motion to reconsider, and there had been no change in the law or other reason demonstrated to warrant reconsidering the issue again. Other pretrial rulings pertinent to this appeal are addressed in the analysis below.

¶ 23                                      B. Trial

¶ 24                              *1. Plaintiff's Case-in-Chief*

¶ 25 The plaintiff's case-in-chief began with the testimony of Dr. Scoutt, a professor of diagnostic radiology at Yale University. She is the author of a chapter about how to perform venous ultrasounds of the lower extremities and the diagnostic criteria for interpreting them in a 2012 textbook titled *Introduction to Vascular Ultrasonography*. She explained that a venous duplex ultrasound is essentially looking for blood clots in the veins; the reason for doing this is to prevent the possibility of a blood clot breaking off from the vein, going through the heart and into the lungs, where it can prevent the lungs from giving oxygen to the blood, resulting in death. This is called a pulmonary embolism.

¶ 26 Dr. Scoutt testified that the ultrasound images of Marshana's right leg included three common components of a venous ultrasound: grayscale images; color Doppler images, which show the direction of blood flow; and spectral Doppler images, which show the undulating waveform indicating changes in the velocity of blood flow as a person breathes. During her direct

examination, Dr. Scoutt narrated the images shown on three exhibits.[1] She testified that the spectral Doppler images on those three exhibits showed that the waveform was "flat," which was an abnormal finding. A flat waveform is potentially an indirect sign that a blood clot in the veins of the pelvis is obstructing respiratory variability in the blood flow into the legs. Dr. Scoutt testified that defendant Petrovic deviated from the standard of care by failing to include in her report that the waveform was abnormal and by undertaking no effort to determine whether the flat waveform was caused by a technical issue or reflected a more significant medical problem. She could have done so by recommending the examination be reperformed with the sonographer turning the patient onto her side to eliminate pressure, particularly if the patient is large; telling the sonographer to have the patient exaggerate breathing or cough; and to obtain a waveform from the opposite leg to check if the waveforms in both legs are symmetrical. A radiologist can also recommend obtaining imaging into the pelvis.

¶ 27      On cross-examination, Dr. Scoutt confirmed that she had reviewed a fourth image of Marshana's leg showing a spectral waveform, which had not been shown to the jury or discussed during her direct examination. On redirect examination, the plaintiff's attorney asked Dr. Scoutt what was shown on the fourth image. The trial court sustained an objection on the basis that this question was beyond the scope of cross-examination.

¶ 28      The plaintiff's next medical witness was Dr. Collier, a board-certified vascular surgeon with extensive experience interpreting venous Doppler ultrasounds. He also reviewed Marshana's ultrasound imaging with the jury and testified that three of the spectral Doppler images showed "flat line flow," indicating a potential blood clot in the iliac veins above the groin. He also testified

---

[1] The trial exhibits are not included in the record on appeal. Accordingly, our description of the exhibits and their contents are based on the witness testimony about them.

that a fourth image, which involved the right popliteal vein running behind the knee, was "virtually flat-lined." He testified that the abnormality shown by the three flat waveforms meant that iliac vein thrombosis could not be ruled out, and the standard of care required the radiologist to report this fact and recommend further testing. Such testing could include a CT scan with contrast, MR scans, or venogram.

¶ 29     Dr. Collier expressed the opinion to a reasonable degree of medical certainty that Marshana had a blood clot in the area above her groin. His basis for this opinion was her young age with nothing else to account for an obstruction, along with the fact that the CT scans and autopsy later confirmed that she had experienced a pulmonary embolism. He expressed the opinion that the inciting event that caused her death was a massive pulmonary embolism; a clot in her iliac vein broke off, traveled through her heart and into her lungs, and blocked off circulation to the lungs. He testified that, if the defendant had complied with the standard of care and recommended the above testing, his opinion was that one of those tests would have revealed the presence of a clot; Marshana would then have been admitted to the hospital and treated with blood thinners. Defendant Petrovic's deviation from the standard of care was thus a direct cause of her death.

¶ 30     Dr. Collier further discussed three pieces of evidence that supported his opinion that Marshana had a blood clot in her iliac vein that led to a pulmonary embolism. The first was that at the time she arrived at the emergency room on September 30, 2016, she was suffering from "pulseless electrical activity." This meant her heart was pumping, but no blood was going through it; a pulmonary embolism is one thing known to cause this, by stopping the blood from going through the lungs and back into the left side of the heart. He testified that the clot that caused this broke up when the emergency personnel performed chest compressions for 30 to 40 minutes. The second piece of evidence was that the CT angiogram showed a large clot sitting between the right-

mid lobe and the right-lower lobe of her lungs. And the third was the autopsy showing that she had "a bunch of little clots all out in the periphery of her lungs," indicating a larger clot had broken up, along with a two-inch by one-inch area of dead lung tissue indicative of a clot. Dr. Collier was asked on direct examination if he had seen anything in the records indicating that Marshana's cause of death was a cardiac problem. However, the trial court sustained a defense objection to this question for nondisclosure pursuant to Supreme Court Rule 213(g) (eff. Jan. 1, 2018).

¶ 31     The plaintiff presented the testimony of diagnostic radiologist Arnold C. Friedman, M.D., by video evidence deposition. To a great extent, the standard of care testimony of Dr. Friedman was similar to that given by Dr. Scoutt and Dr. Collier. Dr. Friedman testified that defendant Petrovic failed to comply with the standard of care in this case; the waveform seen in the imaging of the femoral vein is "unequivocally flat and abnormal, and this should have been reported as such, with recommendations for further investigation as to the etiology of this flattening." A flat waveform could indicate a clot in the vein causing obstruction. It could also indicate a DVT at a level closer to the heart than where the image is taken, and this is a potentially life-threatening situation such that the possibility must be excluded. Follow-up investigation to do so could have included repeating the examination of the right leg, performing an ultrasound of the left leg to see if the result was the same, or performing a CT venogram with contrast to look at the vein. Dr. Friedman recognized that there was some blood flow indicated at the popliteal area in the images at issue; however, the waveform at that level showed only "minimal phasicity,"[2] which had no bearing on the fact that the femoral vein above it was "unequivocally abnormal and requires further investigation." On cross-examination, Dr. Friedman testified that in 2014 he had been disciplined

---

[2] Dr. Friedman explained that "phasicity," a term commonly used by the medical witnesses in this case, refers to the undulating of a waveform. A waveform that is flat has no phasicity.

in three states arising from his interpretation of an imaging study done to rule out aortic dissection.

¶ 32 The plaintiff's primary medical causation witness was Dr. Kaufman, a board-certified surgical pathologist. After reviewing the medical records and autopsy materials, he testified to the opinion that Marshana died of complications arising from a major pulmonary embolus; these complications included a partial acute heart attack and brain damage, but the process started with a pulmonary embolus. Asked how her heart was involved with the chain of death, he explained:

> "She had, unknown at the time she was alive, a small heart attack that was about 24 to 48 hours old. And, in my impression, that this was embolic, meaning that it was a result of a blood clot going down into a small branch of her coronary arteries. *** She was only 17 years old. So the arteries themselves were normal. So this blockage was caused by part of the blood clot that basically went from the right side of her heart, which is where the embolus goes, over to the left side, and there are a few ways that can happen. *** But that was a consequence of the embolus. It wasn't a heart attack causing the embolus, but the embolus causing the heart attack."

The basis for his conclusion that the pulmonary embolus was the inciting cause of the other complications was the CT scan of the lungs, showing an infarction of the right lower lobe and a small infarction in the left upper lobe, along with "small emboli seen all over the place" in the sections of lung that were taken on autopsy. This was clear evidence that the pulmonary embolus had broken up by the time she died, but evidence of its existence was still present.

¶ 33 Dr. Kaufman testified that he did not see any evidence that Marshana suffered from cardiac hypertrophy. There was no evidence of valvular disease or that she had hypertension. Given the normal weight of her heart on autopsy, he had concerns that the measurement of the left ventricle wall had been taken while the heart was in systole and was therefore not accurate as to its true

thickness.

¶ 34    Dr. Kaufman reviewed various autopsy slides with the jury. He testified that the lung tissue was "completely hemorrhagic," meaning bloody, and "not normal," and "there is a pulmonary embolus right there which caused the death of that lung tissue." He also found evidence of a blood clot in the walls of the veins of the uterus continuous with the right internal iliac vein, which would have been present for one week and correlated with Marshana's complaints of gluteal pain. He testified that a slide from the left ventricle showed a band of inflammatory cells about 24 to 48 hours old, indicating that the heart attack had followed the embolus.

¶ 35    In addition to the medical witnesses, the plaintiff also presented the testimony of six family members who testified about Marshana's life, her family relationships, the loss of society sustained by the next-of-kin, and other matters of damages. In summary, their testimony showed that Marshana was born in 1999 to Antanette Carter, then age 14, and Pierre McCaley, then age 17. At that time, both Antanette and Pierre were living with their extended families in apartments at Cabrini-Green in Chicago. After Marshana was born, Antanette moved in with Pierre's family, and Marshana lived with them until she was seven months old. At that time, Marshana was discovered to have a broken leg; she was removed from her parents' custody and placed into custody of the Department of Children and Family Services (DCFS). Marshana was eventually placed in the guardianship of Pierre's cousin, Lolita McCaley, who had raised Pierre since age 3, and thereafter Lolita raised Marshana as if she were her granddaughter. Marshana remained with Lolita until age 14, and Pierre also lived with them on and off during that time, the last time being when Marshana was about 9 years old. Around the time Marshana was 10 or 11 years old, Antanette moved to Arizona and has lived there since that time. Marshana has four half-siblings on her father's side, but she largely grew up apart from them.

¶ 36    Lolita testified that Marshana was always a smart child who loved school and got good grades. She had planned to go into the Navy when she graduated college. Lolita described that Pierre would take care of Marshana, spend time with her, and take her places. Antanette had supervised visitation with Marshana two or three times a month prior to moving to Arizona, and Lolita described her as having a loving relationship with Marshana. When Marshana was 15, she voluntarily left Lolita's home and thereafter lived in several different foster homes.

¶ 37    Antanette described Marshana as "the love of my life." She testified that she was not in a position to care for Marshana as a teenager and was grateful that Pierre's family could take her in. Antanette testified that she "had a rough life" and "wasn't the best at being present all the time," but she visited Marshana when she could. She testified that she moved to Arizona to get away from the negativity and setbacks that existed in her life in Chicago, and she wanted to get an education and a decent job to take care of Marshana. She testified that Marshana had planned to go to college and also to join the Navy. She testified that they would speak on the phone four or five times per week for several hours. She testified that she felt that their lives were just reaching the point where they would be able to spend more time with each other, and she lost that. On cross-examination, she testified that she did not physically return to Chicago after moving to Arizona in 2011. She did not know where Marshana had gone to high school or the names of her friends.

¶ 38    Pierre testified that he saw Marshana every day when they were living together at Lolita's house. He was with her for her first steps, and her first word was "Dada." He testified that he was unstable as a young man and bounced around among various homes. However, he would visit Marshana at Lolita's house, take her to the park to play, and help her with homework. He saw her infrequently once she moved out of Lolita's house into the other foster homes, but they would speak on the telephone sometimes. The last time they spoke was after her tonsillectomy, and he

saw Marshana at Trinity Hospital and Christ Hospital after she collapsed. He testified that losing Marshana was painful, and it feels "like a piece of me is gone" since her death.

¶ 39    Three of Marshana's siblings testified at trial. Rondale Kevon Martin, who was one year older, testified that he would see Marshana at events such as cookouts, family reunions, and visits to Lolita's house. He talked with her on the phone about twice a month. He testified that he loved Marshana "[f]rom the bottom of my heart" and that he "miss[es] her so much." Melony Harris, who was two years younger, testified that Marshana would take the bus to come visit her, and she relied on the advice and guidance that Marshana gave her as an older sister. She loved Marshana and described feeling "a void that can't really be replaced" in her life since losing her. Mariah Nichols testified that she was 5 years old when Marshana died and was 11 at the time of trial. She remembers playing with Marshana and texting with her on Instagram before she died. She feels sad about her sister's death, and she misses her.

¶ 40                              *2. Defendants' Case-in-Chief*

¶ 41    The first medical witness presented in the defendants' case-in-chief was Randall K. McGivney, D.O., a board-certified pathologist who expressed three main opinions. First, he testified that there was no evidence of any large or saddle pulmonary embolus at the time of Marshana's autopsy. This is something that would have been evident to the pathologist who performed the autopsy, and that pathologist described no such thing. The multiple tiny thrombi noted on the autopsy report do not suggest the presence of a large pulmonary embolus, because pulmonary emboli do not break up. Aggressive efforts at resuscitation would not have caused a pulmonary embolus to break up. Second, he testified that the autopsy showed evidence of acute heart damage and a preexisting heart condition. She had an acute myocardial infarction involving the bottom half of the heart that was 24 to 48 hours old. Also, her heart weighed only 330 grams,

but the pathologist measured her left ventricle wall at 2.4 centimeters, which was evidence of left ventricular hypertrophy or cardiomyopathy. Third, he testified that the absence of fibroblasts in the clot seen in her uterine vein meant that clot had existed no longer than 72 hours prior to her death, meaning it developed after the ultrasound at issue was performed.

¶ 42    On cross-examination, Dr. McGivney acknowledged that the report of the chest CT scan stated that the heart was normal size. He acknowledged that the pathologist who performed the autopsy did not give an opinion as to the cause of death. If Dr. McGivney had performed the autopsy, he would have given the cause of death as acute myocardial infarction. He would also have listed peripheral emboli and an infarct in the right lobe of her lungs, although he considered these only comorbidities in her disease process that did not cause her death. He testified that he had no opinion about what caused her myocardial infarction.

¶ 43    The defendants next presented the testimony of Michael Racenstein, M.D., a board-certified diagnostic radiologist. In his testimony, Dr. Racenstein narrated what was shown in the 11 ultrasound images taken of Marshana's right leg on September 28, 2016, along with several demonstrative exhibits showing what ultrasound imaging looks like when a clot exists. After doing so, he expressed the opinion that no blood clot was present here, the study was normal, and nothing about it would indicate to a radiologist that a clot existed anywhere. He explained that the gray-scale images, color flow overlay, and compression images were all normal. Although the spectral images showed "not much phasicity" higher in the leg but "a little bit of phasicity toward the knee," this is explained by the fact that Marshana weighed 209 pounds with a large body habitus; thus when she is lying down, the "pressure that goes onto the veins in the abdomen cause a lack of phasicity." When she was turned to image the portion of the leg at the level of the popliteal vein, some of that pressure was taken off the veins in the abdomen and pelvis, which is why there was

"a little bit of phasicity in the popliteal vein." This was a normal and expected finding in a patient of Marshana's habitus. Accordingly, Dr. Racenstein testified that defendant Petrovic interpreted this study as normal showing no evidence of DVT, and she complied with the standard of care in the accurate interpretation of this study. He added that the standard of care did not require her to comment in her report about the spectral waveforms shown on 4 of the 11 images in the study.

¶ 44    On cross-examination, Dr. Racenstein agreed that it was unknown whether a clot existed in Marshana's body outside the area shown in the imaging, either below the knee or above the groin. On redirect examination, he expressed the opinion that that she had no clot in the pelvis because phasicity is seen in the popliteal vein, which is to be expected when she is imaged on her side.

¶ 45    The next witness for the defendants was Dr. Fintel, who is board-certified in the areas of internal medicine, cardiovascular diseases, and nuclear cardiology. He testified that Marshana did not die as the result of complications of a pulmonary embolus. Instead, she died from acute complications of a cardiac condition known as left ventricular hypertrophy, which led to sudden cardiac death, damage to the heart muscle, and brain damage due to lack of oxygen. Further, no pulmonary embolus caused the myocardial infarction that led to these complications.

¶ 46    He testified that, for a pulmonary embolus to cause cardiac arrest, there must be a blood clot of sufficient mass to lodge in the central circulation of the lungs and reduce blood flow into the lungs and heart. There is no evidence in either the CT scan taken at Trinity Hospital or in the autopsy of such a saddle pulmonary embolus clogging the main pulmonary trunk or pulmonary arteries. That CT scan of the chest indicated the blood was flowing in the lungs without evidence of substantial blockage of blood flow. Also, her blood-oxygen concentration readings in the emergency department were not very low, which would be expected if a major blood clot was still present in her lungs at the time of resuscitation. Her BNP (brain natriuretic peptide) levels were

below detectible levels, which suggests her ventricles had not been stretched by a pulmonary embolus. The small blood clots seen in the autopsy were not of sufficient size, bulk, or extensivity to explain what happened to her; their presence is more likely explained by the catheters placed at the hospital to give her fluids.

¶ 47    Dr. Fintel further testified to the evidence demonstrating that Marshana had preexisting hypertrophic cardiomyopathy, which caused her cardiac arrest. Certain EKG readings taken upon her arrival at Trinity Hospital showed ST segment elevation or reciprocal changes that are indicative of acute myocardial injury. Also, her troponin levels were elevated, suggesting that some sort of injury was occurring to her heart. The autopsy findings showed that her left ventricular wall was 2.4 centimeters thick, whereas normal thickness would be 1.1 centimeters. There was also a description of discoloration at the apex of the left ventricle.

¶ 48    On cross-examination, Dr. Fintel testified that he had not calculated the ratio of the thickness of the left ventricle and the right ventricle, but the data would be 2.4 over 0.6. He was asked how that ratio comported with his theory that there was left ventricular hypertrophy, and he answered that he usually does not focus on the ratio in clinical practice.

¶ 49    Defendant Petrovic was the next witness to testify for the defense. After testifying to her medical background, she reviewed the 11 ultrasound images with the jury and explained why she concluded that there was no evidence of DVT. Regarding the spectral imaging, she agreed that several of the images did not show significant phasicity. However, she explained that this is a normal and expected finding in a patient of Marshana's body size, due to the pressure placed on the abdomen by the pannus when the patient is laying down. By contrast, imaging at the level of the popliteal vein occurs after the patient is repositioned; if there had been an obstruction in Marshana's iliac system, the waveform at the popliteal level would also have been flat, which it

was not. Accordingly, the impression she reported was that there was no evidence of DVT to the level of the popliteal fossa in the right lower extremity. She testified that she complied with the applicable standard of care.

¶ 50    Matthew Blecha, M.D., who is board-certified in both general surgery and vascular surgery, testified that a pulmonary embolism did not cause Marshana's cardiac arrest or brain death. He extensively reviewed the chest CT scan with the jury and testified that it showed that Marshana's left ventricle was abnormally enlarged at 2.5 centimeters in thickness. He also testified that the CT scan did not show signs consistent with the presence of a massive pulmonary embolism that had broken into smaller pieces after stopping the patient's heart; if she had suffered from a massive pulmonary embolism, thrombi from that would be seen in the periphery of the lungs within the pulmonary vasculature, and those were not present. He testified that he did not see a large enough clot burden to induce cardiac arrest. He further testified that he did not find evidence of a proximal venous thrombus in her iliac system at any time. A spontaneous right common iliac vein thrombus is "remarkably rare," and there was no evidence of it in the autopsy report. He also testified that the EKG and BNP measurements were negative for right heart strain, which can manifest if there is a saddle embolus blocking the pulmonary arteries.

¶ 51    On cross-examination, Dr. Blecha acknowledged that based on the studies in this case, it cannot be definitively determined whether there was a venous thrombosis above the groin. He also testified that he did not calculate the ratio of the left ventricular wall to the right ventricular wall prior to coming to court; however, he agreed that this ratio was "an important thing to look at."

¶ 52    Jeffrey Huml, M.D., who is board-certified in internal medicine, pulmonary medicine, critical care medicine, and neurocritical care medicine, testified that the cause of death in this case was acute transmural myocardial infarction at the apex of the heart, resulting in a malignant cardiac

arrhythmia and sudden death. A massive pulmonary embolism was not the cause of death. Dr. Huml testified that the chest CT showed that the right ventricle was not dilated, which would have been expected if a pulmonary embolism had occurred; also, the amount of clot seen in the lungs is at most 5% of the total pulmonary vascular volume, indicating it was not a massive pulmonary embolism. He testified that the EKG demonstrated ST segment elevation, suggesting an acute injury occurring to the inferior wall of the heart. The echocardiogram performed at Christ Hospital also showed no evidence of right ventricular dysfunction, and the right ventricle fails when a person dies of a pulmonary embolism. Further, the normal BNP and elevated troponin readings indicate that the right ventricle was not stretched. Thus, he testified, Marshana had two things going on, a pulmonary embolus and an acute myocardial infarction; the pulmonary embolus did not kill her, but the myocardial infarction caused an arrhythmia that resulted in her death.

¶ 53    On cross-examination, Dr. Huml agreed that an elevated troponin reading can be due to resuscitative measures. He also agreed that elevated D-dimer levels can be a reflection of a pulmonary embolism, but he did not know what the D-dimer levels were in this case. He agreed that the pathologist who performed the autopsy in this case did not state any diagnosis of a cardiac nature in stating the cause of death.

¶ 54    The defendants' final witness was Perry Gilbert, M.D., a board-certified diagnostic radiologist with a subspecialty board certification in interventional radiology. Dr. Gilbert testified that defendant Petrovic complied with the standard of care in her interpretation and reporting of the ultrasound at issue. He testified that she was required to recognize and take into account the waveforms seen on spectral imaging, but there was no need to comment on them. He testified that the although normal variation or phasicity is not seen with the flat waveform, "continuous flow going up toward the heart from the leg" is seen. This is a result of Marshana's body size. He also

testified that phasicity in the common femoral region is an unreliable indicator of a blood clot in the pelvis; phasicity is the least sensitive or specific part of an ultrasound study, and in the absence of swelling, seeing a continuous flow pattern in a patient with a larger body habitus is a relatively normal finding. Given that defendant Petrovic correctly believed that this was a normal study, she had no duty to communicate a recommendation for additional imaging.

¶ 55                                    *3. Closing Arguments*

¶ 56        In closing arguments, the plaintiff's attorney argued that various facts undermined the defendants' theory that a preexisting condition of left ventricular hypertrophy caused Marshana's heart attack and death, unrelated to any pulmonary embolism. Counsel cited the fact that the pathologist who performed the autopsy did not mention anything about ventricular hypertrophy in the autopsy report. Counsel argued that another reason for this was because the ratio of the sizes of the two sides of the heart matters, and no defense expert had discussed that ratio in testimony. Counsel argued that Dr. Fintel had admitted that the ratio is important, but he testified that he had not calculated it prior to coming to testify. Counsel argued that ventricular hypertrophy "was not there, and that is why you never heard about ratios."

¶ 57        The attorney for defendant Petrovic argued that plaintiff had failed to present the testimony of any witness to contradict the causation testimony of Dr. Huml or Dr. Fintel that left ventricular hypertrophy caused Marshana's unexpected heart attack. Counsel argued that Dr. Blecha had shown on the CT scan how the hypertrophy was measured and that her left ventricle was 2.5 centimeters thick. The attorney for defendant Chicago Imaging similarly argued that Marshana died of a sudden heart attack caused by the condition of left ventricular hypertrophy, stating, "I don't believe there's much dispute on this point." Counsel cited Dr. Fintel's testimony that heart attacks can occur in a young person with a thickened left ventricle. Counsel for Advocate similarly

argued that the plaintiffs had failed to call any witness to discredit the testimony of Dr. Fintel that the cause of death was a cardiological reason, not a DVT.

¶ 58                                   *4. Verdict and Posttrial Proceedings*

¶ 59        Following deliberations, the jury rendered a verdict in favor of all of the defendants and against the plaintiff. The jury also answered "no" to a special interrogatory that asked whether defendant Petrovic was the apparent agent of Advocate. The trial court entered judgment on the verdict. The trial court later denied the plaintiff's posttrial motion, seeking a new trial. This appeal then followed.

¶ 60                                          II. ANALYSIS

¶ 61                               A. Barring Testimony by Dr. Waxman

¶ 62        The plaintiff's principal argument on appeal is that she was deprived of a fair trial by the trial court rulings that barred her from presenting the testimony of Dr. Waxman and also barred her previously disclosed experts from relying on Dr. Waxman's report as a factual basis for their opinions as to the cause of Marshana's death. The plaintiff argues that these rulings effectively precluded her from rebutting the defendants' entire theory of causation that Marshana's death resulted from a sudden cardiac event. The plaintiff argues that she acted in a relatively timely manner to obtain and disclose Dr. Waxman's testimony after the defendants disclosed the testimony of Dr. Fintel and presented him for deposition. She adds that no trials were proceeding at the time she disclosed Dr. Waxman due to the COVID-19 pandemic, and thus her disclosure of Dr. Waxman's report occurred nearly 16 months prior to the commencement of trial.

¶ 63        In response, the defendants argue that the barring of Dr. Waxman's testimony was a proper action by the trial judge in refusing to reverse a discretionary discovery ruling by a motion judge. They also argue that the plaintiff forfeited review of this issue by failing to request rebuttal again

during trial or make an offer of proof. On the merits, they argue that the disclosure of Dr. Waxman was merely an effort to bolster the plaintiff's theory of causation that Marshana's cause of death was a pulmonary embolism; that no "new" issue was raised by Dr. Fintel's opinions to justify rebuttal testimony; that Dr. Waxman's report does not rebut Dr. Fintel's opinion that a myocardial infarction caused Marshana's death; and that the plaintiff's disclosure of Dr. Waxman was untimely under the case management orders and supreme court rules. Finally, the defendants argue that the plaintiff has failed to show that she suffered prejudice by the exclusion of Dr. Waxman's testimony.

¶ 64        " '[W]here a defendant introduces evidence of an affirmative matter in defense or justification, the plaintiff, as a matter of right, is entitled to introduce evidence in rebuttal as to such affirmative matter.' " *Flanagan v. Redondo*, 231 Ill. App. 3d 956, 967 (1991) (quoting *Loftus v. Loftus*, 134 Ill. App. 360, 362 (1907)); accord *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 50; *Chapman v. Hubbard Woods Motors, Inc.*, 351 Ill. App. 3d 99, 106 (2004). Rebuttal evidence is evidence that tends to explain, repel, contradict, counteract, or disprove facts placed in evidence by an adverse party. *Hall v. Northwestern University Medical Clinics*, 152 Ill. App. 3d 716, 721 (1987).

¶ 65        Although a plaintiff's right to present rebuttal evidence in appropriate cases is clearly recognized under Illinois law, our rules provide few guidelines or timeframes for the disclosure of rebuttal witnesses or testimony in civil cases. *Cf.* Ill. S. Ct. R. 412(a) (eff. Mar. 1, 2001) (addressing disclosure of rebuttal witnesses in criminal proceedings); Fed. R. Civ. P. 26(a)(2)(D)(ii) (eff. Dec. 1, 2015) (setting time for disclosure of rebuttal evidence in federal civil cases). Illinois Supreme Court Rule 218(c), which addresses orders to be entered at case management conferences, provides in pertinent part, "All dates set for the disclosure of witnesses, including rebuttal witnesses, and

the completion of discovery shall be chosen to ensure that discovery will be completed not later than 60 days before the date on which the trial court reasonably anticipates the trial will commence, unless otherwise agreed by the parties." Ill. S. Ct. R. 218(c) (eff. July 1, 2014). The pertinent committee comment to that rule states in part that it "is amended to clarify that case management orders will set dates for disclosure of rebuttal witnesses, if any." Ill. S. Ct. R. 218, Committee Comments (rev. Oct. 4, 2002). Supreme Court Rule 213 governs the disclosure of witnesses and their testimony in general, although it contains no provision specific to rebuttal witnesses or testimony. See Ill. S. Ct. R. 213 (eff. Jan. 1, 2018).

¶ 66　　　　One rule important to the disclosure of rebuttal evidence is that a plaintiff is not required "to anticipate and present all conceivably relevant evidence in her case in chief" at the risk of being "barred from presenting that evidence in rebuttal in the event defendants presented evidence in their case in chief that plaintiff needed to counter." *Hoem v. Zia*, 159 Ill. 2d 193, 204 (1994). Accordingly, evidence that otherwise qualifies as proper rebuttal evidence is not rendered improper rebuttal evidence merely because it could have been presented during a plaintiff's case-in-chief (or disclosed in an initial disclosure). *Chapman*, 351 Ill. App. 3d at 107. However, the purpose of rebuttal is not to provide a second opportunity to present evidence that was or should have been presented in a plaintiff's case-in-chief (see *Naleway v. Agnich*, 386 Ill. App. 3d 635, 649 (2008)), and a trial court acts within its discretion by striking or disallowing evidence that does not qualify as proper rebuttal evidence. *Rodriguez v. City of Chicago*, 21 Ill. App. 3d 623, 625-26 (1974). While evidentiary rulings involving the admission of rebuttal evidence are within the sound discretion of the trial court, an abuse of discretion may occur where a party is prevented from impeaching a witness, supporting the credibility of an impeached witness, or responding to new points raised by the adverse party. *Klingelhoets*, 2013 IL App (1st) 112412, ¶ 50; *Chapman*,

351 Ill. App. 3d at 106; accord *Hoem*, 159 Ill. 2d at 204-05.

¶ 67    Applying the principles set forth above, we conclude that an abuse of discretion occurred when the plaintiff was barred from presenting any testimony by Dr. Waxman at trial, because this ruling prevented the plaintiff from responding to the new theory raised by the defendants that Marshana's death was caused by a preexisting cardiac issue that led to an acute heart attack. In the plaintiff's initial expert witness disclosures, the theory of causation that was advanced by Dr. Kaufman and Dr. Collier was that Marshana's cause of death was a pulmonary embolism, which resulted from the blood clot that was allegedly present and not detected by defendant Petrovic as of September 28, 2016. We glean from the parties' arguments and Dr. Kaufman's trial testimony that he elaborated on this opinion at his discovery deposition, by explaining that this pulmonary embolism was the inciting event that led Marshana to experience other complications, including a heart attack and brain death. His testimony, however, was that a pulmonary embolism was the inciting cause of any heart attack that she suffered.

¶ 68    The defendants thereafter disclosed the testimony of Dr. Fintel to testify that the cause of Marshana's cardiopulmonary arrest, collapse, and eventual death was an acute myocardial infarction in the setting of hypertrophic cardiomyopathy. They further disclosed that Dr. Fintel would testify to the related opinion that there was no evidence to suggest that a massive pulmonary embolism caused the cardiopulmonary arrest, including, *inter alia*, evidence of "the lack of right ventricle enlargement on the echocardiogram dated 10/1/2016 at 9:43 a.m."

¶ 69    This cardiac-based theory of causation introduced into the case by the defendants' disclosure of Dr. Fintel's testimony constituted new, affirmative matter to which the plaintiff was entitled as a matter of right to introduce rebuttal evidence. See *Klingelhoets*, 2013 IL App (1st) 112412, ¶ 50; *Flanagan*, 231 Ill. App. 3d at 967. The defendants argue on appeal that their disclosure did not

inject a "new" issue into the case by refuting the plaintiff's causation theory with an alternative opinion as to the cause of death. They assert that all parties had access to the evidence upon which Dr. Fintel based his opinions, and they argue that the plaintiff could have retained a qualified witness to address the cardiac issues presented in the medical records, autopsy report, and death certificate in her initial disclosures. In other words, a causation defense based on an alternative cardiac cause of death is something that the plaintiff should have anticipated and thus a topic on which the plaintiff should have disclosed expert testimony.

¶ 70    The defendants' argument is contrary to the case law, which does not require a plaintiff disclosing expert witnesses to anticipate all defenses that may be raised at the risk of losing the right to rebuttal. Our supreme court recognized this principle in *Hoem*, stating as follows:

> "On appeal to this court, defendants argue that the trial court properly restricted the scope of Dr. Schoene's testimony. They maintain that plaintiff committed a fundamental tactical error in the preparation of her case for trial by retaining an inappropriate expert and should not be allowed to rectify this mistake through rebuttal.
>
> We cannot agree with this tactical-error analysis. To adopt the defendants' view on this issue would be tantamount to requiring a plaintiff to anticipate and present all conceivably relevant evidence in her case in chief, because, otherwise, she would be barred from presenting that evidence in rebuttal in the event defendants presented evidence in their case in chief that plaintiff needed to counter. As stated by the appellate court in this case, such a rule would be 'antithetical to the concerns expressed by all involved in our civil justice system about its present costs, wastes, and delays.' [Citation]." *Hoem*, 159 Ill. 2d at 204.

We likewise reject the argument of the defendants that Dr. Fintel's causation opinions were not

"new" in the sense that the plaintiff should have anticipated the defendants' raising this defense and made a preemptive disclosure on the topic. Further, based on our review of the two points of evidence cited by the defendants as purportedly putting the plaintiff on notice of this defense—the autopsy report and Dr. Kaufman's deposition testimony that Marshana suffered a heart attack from the pulmonary embolism—we think the defendants are overstating the extent to which a defense theory of a preexisting cardiac issue should have been anticipated by the plaintiff.

¶ 71     The defendants also argue that Dr. Waxman's report did not rebut Dr. Fintel's opinion that Marshana's cause of death was hypertrophic cardiomyopathy that led to an acute myocardial infarction. They characterize the plaintiff, under the guise of disclosing rebuttal evidence, as merely attempting to bolster her theory of causation with "a third causation expert to opine that Marshana died from a pulmonary embolism." We disagree. Dr. Waxman's report was proper rebuttal evidence, as it is evidence that tends to explain, repel, contradict, counteract, or disprove facts introduced into the case by the defendants' disclosure of Dr. Fintel's testimony. See *Hall*, 152 Ill. App. 3d at 721.

¶ 72     Although Dr. Waxman's report does not mention Dr. Fintel's testimony or delineate specific disagreements with it, his report is clearly focused on addressing the cardiac evidence of this case obtained from the CT imaging and autopsy findings. The pertinent conclusion he states is that, "[b]ased on clinical findings and the autopsy, there is no evidence of coronary artery disease, myocardial ischemia, or cardiomyopathy. This patient has no other culprit lesions or risk factors for her untimely death other than pulmonary embolism." His report states that the CT scan "demonstrated marked dilation of the RV [(right ventricle)]," which appears to us to rebut the statement in Dr. Fintel's disclosure that no right ventricle enlargement was shown on the echocardiogram. His report also references that the CT imaging shows evidence of "leftward septal

bowing" and that measurements of the ratio of the right ventricle diameter over the left ventricle diameter were greater than 1 (specifically 1.62), indicative of a severe episode of pulmonary embolism. The report concludes with the following explanation into the cardiac physiology at play in this case:

"Under physiologic conditions, the interaction between the RV [(right ventricle)] and the relatively low pulmonary vascular impedance results in a pressure less than one quarter that of the left ventricle. The right ventricle operates at rest at a maximum efficiency level, and stroke work is achieved with the minimum oxygen consumption. Acute embolic obstruction of a significant amount of the pulmonary circulation (usually estimated as more than 30%) increases pulmonary vascular resistances, leading to acute pulmonary artery hypertension. Abrupt pulmonary vascular obstruction occurring during pulmonary embolism is further worsened by the release of vasoactive agents from plasma, platelets, or tissue and reflex pulmonary artery vasoconstriction, leading to systemic arterial hypoxemia. The right ventricle may compensate for right ventricular outflow obstruction by using the Frank-Starling mechanism and, eventually, increased contractile performance. However, this compensation requires an increase in work transmission from the right ventricle to its vascular bed, leading to a greater myocardial oxygen demand and a reduction in right ventricular mechanical efficiency. Besides, pericardial constraint and right ventricular dilation cause bowing of the interventricular septum toward the left ventricle, resulting in a decreased left ventricular preload. Subsequently, decreased left ventricular output and decreased systemic arterial pressure may result in a downward vicious circle of compromised coronary perfusion, increasing ventricular hypoxemia and right ventricular dysfunction, and eventually cardiogenic shock, right ventricular

infarction, and finally circulatory collapse, and death."

¶ 73 To be sure, there are aspects of Dr. Waxman's report that are difficult for the court as laypersons to interpret. However, it is clear from this report that Dr. Waxman's disclosed testimony was focused on the cardiac evidence of this case, addressing why the cardiac findings on the CT imaging and autopsy support the conclusion that a pulmonary embolism occurred, and contradicting the newly disclosed defense theory that a condition of cardiomyopathy existed and caused the heart attack and death in this case. Dr. Waxman's testimony thus qualifies as proper rebuttal evidence that the plaintiff should have been allowed to disclose and present at trial. The fact that it concomitantly supports the causation theory advanced in the plaintiff's case-in-chief does not render it improper as rebuttal evidence.

¶ 74 The defendants argue that the plaintiff is attributing error to the trial judge in refusing to "reverse" the motion judge's rulings barring Dr. Waxman from testifying. They argue that under the principles set forth in *Balciunas v. Duff*, 94 Ill. 2d 176 (1983), the trial judge appropriately exercised discretion by refraining from reconsidering discretionary discovery rulings made by a predecessor judge handling the case. In *Balciunas*, the supreme court reiterated that "prior interlocutory rulings should be modified or vacated by a successor judge only after careful consideration." *Id.* at 187. "In the context of discovery, where abuse is said to be widespread and delay phenomenal [citations], we think it is particularly appropriate for a judge before whom a motion for reconsideration is pending to exercise considerable restraint in reversing or modifying previous rulings." *Id.* at 187-88. "This is especially true if there is evidence of 'judge shopping' or it is apparent that a party is seeking, for delay or abusive purposes, a reconsideration of prior rulings." *Id.* at 188. Accordingly, "a successor judge, before whom the case has been assigned, should revise or modify previous discovery rulings only if there is a change of circumstances or

additional facts which warrant such action." *Id.*

¶ 75		We reject the defendants' arguments to affirm the barring of Dr. Waxman's testimony under the principles of *Balciunas*. First, nothing in the record indicates that the plaintiff's request for the trial judge to reconsider this issue involved "judge shopping" or an attempt to unduly delay trial. Second, since *Balciunas*, courts have recognized on multiple occasions that a successor judge has the power to and should exercise discretion to undo a discretionary ruling by a predecessor judge on the case that is erroneous as a matter of law. *Russo v. Corey Steel Co.*, 2018 IL App (1st) 180467, ¶ 28 (citing *McClain v. Illinois Central Gulf R.R. Co.*, 121 Ill. 2d 278, 287-92 (1988); *Bailey v. Allstate Development Corp.*, 316 Ill. App. 3d 949, 956-57 (2000); *Lake County Riverboat L.P. v. Illinois Gaming Board*, 313 Ill. Ap. 3d 943, 950 (2000)); accord *Towns v. Yellow Cab Co.*, 73 Ill. 2d 113, 121 (1978). In this case, as explained above, the rulings striking of the testimony of Dr. Waxman were erroneous as matter of law, because they prevented the plaintiff from responding with appropriate rebuttal evidence to the new cardiac theory of causation raised by the defendants' disclosure of Dr. Fintel's testimony. Although we are sympathetic to the position in which the trial judge was placed in this case, we agree with the plaintiff that upholding the barring of rebuttal testimony by Dr. Waxman constituted an abuse of discretion.

¶ 76		In reaching this holding, we recognize that the trial judge may have been influenced by two incorrect legal arguments made by defense counsel at oral arguments on the motion for reconsideration of rebuttal testimony. One was that in disclosing witnesses, the plaintiff was obligated not only to advance the plaintiff's own theory of causation but also "to be prepared for alternative theories" that may be raised by the defendants. As discussed above, this is not an accurate statement of the burden placed on a plaintiff in disclosing expert testimony. See *Hoem*, 159 Ill. 2d at 204. Second, counsel for defendant Petrovic argued the appropriate venue for the

plaintiff to obtain review of the motion judge's rulings striking Dr. Waxman's testimony was in the appellate court, and the plaintiff should have sought a finding under Supreme Court Rule 304(a) (eff. Mar. 8, 2016) to pursue an interlocutory appeal. This was not an option available to the plaintiff. For a ruling to be appealable under Rule 304(a), there must be a "final judgment as to one or more but fewer than all of the parties or claims." *Id.* The ruling barring Dr. Waxman's testimony would not constitute a final judgment as to any party or claim, and as such it could not have been made appealable by the inclusion of Rule 304(a) language in the order. See *MidFirst Bank v. McNeal*, 2016 IL App (1st) 150465, ¶ 25. We perceive no basis by which the plaintiff could have obtained appellate jurisdiction over the motion judge's interlocutory rulings striking the testimony of Dr. Waxman.

¶ 77　　　The defendants also argue that it was incumbent upon the plaintiff to renew her request to present rebuttal evidence after Dr. Fintel testified at trial and to make an offer of proof. They argue that the plaintiff forfeited appellate review of this issue by failing to do so. We reject this argument. The issue of rebuttal evidence had been repeatedly raised by the time of trial, and, as the plaintiff points out, the defendants cite no authority for the proposition that the plaintiff was required to renew her request to call Dr. Waxman after Dr. Fintel testified. As for an offer of proof, this is generally required when a trial court refuses evidence in order to make the ruling appealable. *Biundo v. Bolton*, 2020 IL App (1st) 191970, ¶ 19. The purpose of an offer of proof is to inform the trial court, opposing counsel, and the reviewing court of the nature and substance of the evidence sought to be introduced. *Id.* However, a formal offer of proof regarding the testimony of a witness as to a certain matter is not required when it is apparent that the trial court clearly understood the nature and character of the evidence sought to be introduced. *Id.* In *Biundo*, this court held that an offer of proof was not required where the Rule 213(f)(3) disclosure of a proposed

expert's opinions and excerpts from his discovery deposition adequately informed the trial court of the nature of the proposed testimony. *Id.* Similarly, here, the written report included in the plaintiff's disclosure of Dr. Waxman adequately informed the trial court of his proposed testimony. We further find that his report is adequate to allow us to understand the nature of the testimony that was excluded and to evaluate the effect of this excluded testimony on the trial.

¶ 78    The defendants argue that the trial court's barring of rebuttal evidence was a proper matter of enforcing its pretrial discovery orders and the supreme court's rules on discovery. Although we recognize that the timing of this disclosure was likely an implied basis of the trial court's rulings, we ultimately cannot accept the argument that the plaintiff's disclosure of Dr. Waxman's testimony was properly stricken on the basis that it was not timely disclosed. First, there was no violation of Rule 218(c), which is the only supreme court rule on the topic of the timing for disclosure of rebuttal witnesses in civil cases. As stated above, that rule provides in part, "All dates set for the disclosure of witnesses, including rebuttal witnesses, and the completion of discovery shall be chosen to ensure that discovery will be completed not later than 60 days before the date on which the trial court reasonably anticipates the trial will commence, unless otherwise agreed by the parties." Ill. S. Ct. R. 218(c) (eff. July 1, 2014). We find no basis for reasonably believing that, as of the time the plaintiff first disclosed Dr. Waxman's testimony, allowing this evidence would have caused the case to run afoul of the 60-day rule of Rule 218(c). The case did not appear on the trial-setting call until nearly 5 months later, and the trial did not commence until 16 months after the plaintiff first disclosed Dr. Waxman's testimony.

¶ 79    Second, no deadline in any case management order was violated by the disclosure of Dr. Waxman's testimony. The plaintiff complied with the requirement of disclosing controlled expert witnesses by December 1, 2020. The form case management order used in this case makes no

provision for any deadline to disclose rebuttal witnesses or evidence. When the plaintiff sought leave to do so, the trial court sent an e-mail to all counsel that stated "there is no rebuttal." This was followed by an order stating, "Rebuttal witnesses are not allowed." Instead, the parties were granted 28 days to "supplement" their respective disclosures. When the plaintiff sought to disclose Dr. Waxman's testimony as a supplemental disclosure, this was met by a motion to strike that was granted by the trial court and upheld on a motion to reconsider.

¶ 80        We understand and are sympathetic to the fact that the trial court and defense counsel no doubt wanted to avoid a situation where the disclosure of Dr. Waxman resulted in substantial further discovery and a delay in setting the case for trial. However, for the reasons discussed, this case presented a situation in which the plaintiff, as a matter of right, was entitled to introduce rebuttal evidence to rebut a new theory of causation raised in the case by the defendants. The plaintiff cannot be precluded from doing so based on unspecified deadlines or an inflexible rule that "[r]ebuttal witnesses are not allowed." Rather, the trial court should have allowed the disclosure and used its discretion to place appropriate limitations on the further discovery resulting from it.

¶ 81        Finally, the defendants argue that reversal is not warranted here because any error in the trial court's exclusion of Dr. Waxman's testimony resulted in no prejudice to the plaintiff. For reversal to be warranted based on an error in the barring of witness testimony, the error must have been sufficiently prejudicial and affected the outcome of the trial. *Halleck v. Coastal Building Maintenance Co.*, 269 Ill. App. 3d 887, 894 (1995). Where it appears that an error did not affect the outcome of the trial, or where the reviewing court can conclude from the entire record that the error did not result in substantial prejudice, the judgment will not be disturbed. *Id.* at 894-95. The burden is on the party seeking reversal to establish prejudice. *Id.* at 895.

¶ 82    We reject the defendants' argument and conclude that the erroneous exclusion of Dr. Waxman's testimony resulted in significant prejudice to the plaintiff's case. Our review of the full trial record reveals that the defendant's theory that Marshana's death was the result of preexisting hypertrophic cardiomyopathy (or left ventricular hypertrophy) that led to an acute heart attack was a significant defense in this case. The plaintiff lacked expert testimony involving the significance of the cardiac evidence by which to counter this defense. Although Dr. Kaufman testified that he did not see any evidence that Marshana suffered from cardiac hypertrophy and expressed opinions that her left ventricle had not been measured accurately during the autopsy, this was stated from the perspective of a surgical pathologist. Dr. Kaufman lacked the expertise into cardiac issues to express opinions about why the cardiac evidence did not support hypertrophic cardiomyopathy as the cause of the heart attack and death and did support pulmonary embolism as the cause. Also, although the plaintiff's counsel attempted on cross-examination and in closing argument to address the significance of the ratio of the diameters of the two ventricles as evidence of pulmonary embolism, this point was no doubt lost on the jury without expert testimony to explain it.

¶ 83            B. Other Witnesses' Reliance on Dr. Waxman's Report

¶ 84    The plaintiff makes the related argument on appeal that the trial erred by ruling that her previously disclosed controlled expert witnesses could not rely on the report of Dr. Waxman as a factual basis for their opinions as to the cause of Marshana's death. The parties make no argument in their briefs specific to this issue. However, as this issue is likely to arise at a new trial on remand, we hold that during the plaintiff's case-in-chief, Dr. Collier and Dr. Kaufman may state that they relied Dr. Waxman's analysis and report as a basis for their opinions, but they may not discuss the contents or substance of that report. Only if the defendants' cross-examination of these witnesses opens the door to this issue may they disclose the contents or substance of Dr. Waxman's report

during the plaintiff's case-in-chief, consistent with the parameters of *Wilson v. Clark*, 84 Ill. 2d 186 (1981), and Illinois Rule of Evidence 703 (eff. Jan. 1, 2011).

¶ 85                                    C. Barring Testimony of Dr. Schuurman

¶ 86       The plaintiff's other principal argument on appeal is that the trial court abused its discretion when it granted the defendants' motions *in limine* to bar the testimony of Dr. Schuurman, a nationally recognized expert on the effects of grief experienced by the survivors of a person who has died. The plaintiff disclosed Dr. Schuurman as a damages witness, and the written report provided as part of her disclosure indicated that she would express four opinions: (1) that Marshana overcame many obstacles, including being born to teen parents unequipped to raise her, traumatic injury as an infant, and foster care placement, but she overcame these by growing into a good student with plans to enter college, (2) that Marshana's death was a devastating emotional loss for her mother Antanette, who lives every day with the stark realization that Marshana was deprived of the life Antanette had envisioned for her, (3) that Marshana's death was a devastating loss for her father Pierre and has caused him grief, sorrow, and emotional distress, and (4) that Marshana's siblings suffered mental distress upon hearing of her death and were upset about it, despite the physical distance that separated them during her life.

¶ 87       The factual basis for these opinions included Dr. Schuurman's reading of the deposition transcripts of the parents and summaries of the depositions of the siblings. She later interviewed them, but this did not occur until after she had given her discovery deposition. She also offered deposition testimony that, to paraphrase, the grief experienced by Marshana's parents must be considered in the context of the difficult circumstances they had faced as teenage parents living with extended family at Cabrini-Green, lacking the resources and environment to care for her during most of her life; the fact that these difficult circumstances had largely prevented them from

being part of her life did not mean that they did not grieve her death and the loss of a chance to rectify this situation in the future.

¶ 88    The trial court granted the motions *in limine* to bar Dr. Schuurman's testimony on the basis that the topic of her proffered testimony was not beyond the ken of average jurors to understand, and thus her testimony would not assist the trier of fact. Expert testimony is admissible if the proffered expert is qualified by knowledge, skill, experience, training, or education, and the testimony will assist the trier of fact in understanding the evidence or determining a fact in issue. *Snelson v. Kamm*, 204 Ill. 2d 1, 24 (2003); accord Ill. R. Evid. 702 (eff. Jan. 1, 2011). As to matters within the common knowledge and experience of jurors, expert testimony is admissible where it is helpful to comprehension or explanation; however, opinions on matters of common knowledge are not admissible unless the subject is difficult of comprehension or explanation. *Thacker v. UNR Industries, Inc.*, 151 Ill. 2d 343, 365 (1992). The assessment of whether a proffered expert is qualified and whether his or her testimony will assist the trier of fact in understanding the evidence, along with the ultimate decision whether to admit expert testimony, are determinations within the sound discretion of the trial court. *Kleiss v. Cassida*, 297 Ill. App. 3d 165, 174 (1998).

¶ 89    We hold that the trial court did not abuse its discretion in barring the testimony of Dr. Schuurman. Based on our review of her opinions and her discovery deposition testimony, we agree that her proffered testimony about the grief experienced by Marshana's family at her death added little that would assist the jury in understanding this evidence. In large part, her disclosed opinions are simply generalized recitations of the family members' statements in deposition. We further find much of her deposition testimony to involve generalities about what Marshana's family members might have experienced, with few statements or opinions that are specific to the actual individuals involved. The family members' own testimony was adequate on this topic. Also,

closing argument offered the opportunity for the plaintiff's attorney to urge the jury to consider the evidence of this family's difficult past circumstances and lost chances at future reconciliation in assessing grief and evaluating other damages.

¶ 90                                D. Errors Pertaining to Dr. Scoutt's Testimony

¶ 91       The plaintiff raises two arguments on appeal regarding the trial court's rulings pertaining to the questioning of Dr. Scoutt. First, on direct examination the plaintiff showed Dr. Scoutt three spectral waveform images and questioned her about them. On cross-examination, defense counsel elicited from Dr. Scoutt that she had reviewed a fourth waveform image, which she had not been shown on direct examination. On redirect, the plaintiff's attorney attempted to show her this fourth waveform image, but the trial court sustained an objection that questions into this fourth image were beyond the scope of cross-examination. We find no abuse of discretion in this ruling. We further note that this issue does not appear likely to recur on remand.

¶ 92       Second, the plaintiff argues that the trial court erred by granting the defendants' motions *in limine* involving the use of medical literature on direction examination, which had the effect of barring Dr. Scoutt, the author of a chapter on interpreting venous ultrasounds of the lower extremities in a seminal textbook on vascular ultrasonography, from fully outlining the medical literature that formed part of the basis of her opinions. The plaintiff argues that she was prejudiced by the fact that the defendants' attorneys were nevertheless allowed to question one of their experts, Dr. Racenstein, about an article set forth by Dr. Scoutt.

¶ 93       However, we agree with the defendants' argument that it is impossible for this court to meaningfully review this issue due to the fact that the plaintiff made no offer of proof as to the testimony that the plaintiff would have elicited from Dr. Scoutt but for the allegedly erroneous ruling. As mentioned above, an offer of proof is generally required when a trial court refuses

evidence for the ruling to be appealable. *Biundo*, 2020 IL App (1st) 191970, ¶ 19. One of the purposes of an offer of proof is to disclose the nature of the evidence sought to be offered so that a reviewing court can determine whether the exclusion of it was erroneous and harmful. *Premier Electrical Construction Co. v. American National Bank of Chicago*, 276 Ill. App. 3d 816, 832 (1995). Generally, the hearsay rule prevents an expert witness from reading or summarizing medical literature on direct examination. See *Schuchman v. Stackable*, 198 Ill. App. 3d 209, 230 (1990); *Mielke v. Condell Memorial Hospital*, 124 Ill. App. 3d 42, 52-56 (1984). However, an expert witness may make limited reference on direct examination to medical literature that serves as a basis for that expert's opinion. See *Lawson v. G.D. Searle & Co.*, 64 Ill. 2d 543, 557 (1976); *Fragogiannis v. Sisters of St. Francis Health Services, Inc.*, 2015 IL App (1st) 141788, ¶ 28; *Becht v. Palac*, 317 Ill. App. 3d 1026, 1034 (2000). In this case, without any understanding of what testimony the plaintiff's attorney wanted to elicit from Dr. Scoutt on this topic, we have no basis for evaluating whether its exclusion by the trial court was erroneous or prejudicial.

¶ 94                                    E. Dr. Friedman's Disciplinary History

¶ 95        The plaintiff's last argument on appeal is that the trial court erred by allowing cross-examination into Dr. Friedman's disciplinary history. At trial, the defendants elicited testimony from Dr. Friedman on cross-examination that in 2014, he had been subjected to professional discipline in three states, arising out of his interpretation of an imaging study to rule out aortic dissection. On appeal, the plaintiff points out that this discipline involved only a reprimand and that his license to practice medicine was not suspended. Relying on *Cetera v. DiFilippo*, 404 Ill. App. 3d 20 (2010), the plaintiff argues that the trial court abused its discretion by admitting evidence of this kind of low-level discipline, as it did nothing to call the expert's credibility into question. The plaintiff also points out that the imaging study for which he was disciplined did not

involve a venous ultrasound, the subject upon which he offered testimony in this case.

¶ 96        In *Cetera*, this court held that a trial court had not abused its discretion in allowing cross-examination of a plaintiff's expert concerning a letter of reprimand he had received from the Illinois Department of Professional Regulation (IDPR) for failing to recognizing the presence of microhematuria in a patient. *Id.* at 35. This reprimand did not result in any restriction being placed on the expert's medical license, and the plaintiff argued that cross-examination into the topic of discipline should only be permissible where it results in a restriction on the expert's practice. *Id.* The plaintiff also argued the reprimand was irrelevant because the case in which he was testifying had nothing to do with microhematuria, but rather it involved the proper diagnosis of an infection and the appropriate treatment for it. *Id.* Rejecting these arguments, this court reasoned that the fact that the IDPR found it necessary to reprimand the plaintiff's expert for the failure to recognize the presence of microhematuria "reflects on [his] qualifications and had some tendency to lessen his credibility as an expert." *Id.* at 35-36.

¶ 97        In this case, we find that *Cetera* does not aid the plaintiff's arguments. Instead, it supports the conclusion that no abuse of discretion occurred when the trial court allowed brief cross-examination of Dr. Friedman about the fact that he had been reprimanded in three states. As in *Cetera*, we cannot say that it was irrelevant to his qualifications or credibility as an expert, even though it had no effect on his license to practice medicine and involved a different kind of imaging study than the one at issue in this case. Accordingly, we reject the plaintiff's argument that the trial court abused its discretion by permitting cross-examination of Dr. Friedman on this topic.

¶ 98                        F. Special Interrogatory Answer

¶ 99        The final argument that we are called upon to address is raised by defendant Advocate, and Advocate is the only defendant to which it pertains. Advocate's argument is that, even if we find

that reversible error occurred and that a new trial is warranted based upon the barring of Dr. Waxman's testimony, we must nevertheless affirm the verdict in favor of Advocate based on the jury's finding on a special interrogatory that defendant Petrovic was not the apparent agent of Advocate. Advocate asserts that none of the issues raised by the plaintiff on appeal relate to apparent agency or challenge this special interrogatory finding, and therefore it argues that the jury's resolution of this question is controlling as to Advocate's liability in this case.

¶ 100     The plaintiff's theory of liability against Advocate, as alleged in the operative fifth amended complaint, was that defendant Petrovic was acting as its actual or apparent agent when she interpreted the venous ultrasound taken of Marshana at Trinity Hospital. It appears that the plaintiff made no effort to establish actual agency at trial. The jury instructions given after the close of evidence instructed the jury that the plaintiff had sued Advocate under the theory of apparent agency, along with the elements that the plaintiff had to prove to establish liability under this theory. See Illinois Pattern Jury Instructions, Civil, No. 105.10 (approved May 2019). Additionally, the jury was instructed to answer a special interrogatory that asked, "Was Polina Petrovic, M.D., the apparent agent of Advocate Health and Hospitals Corporation d/b/a Advocate Trinity Hospital?" The jury's answer to this special interrogatory was "No."

¶ 101     In support of its argument, Advocate relies on *Law v. Central Illinois Public Service Co.*, 86 Ill. App. 3d 701 (1980), which arose out of an incident in which the plaintiff's decedent was electrocuted while attempting to jump from a burning truck that was touching electrical wires. At trial, the jury returned a verdict in favor of all defendants. It also found by special interrogatory that the plaintiff's decedent was contributorily negligent, which at that time was a complete defense in an action premised upon the negligence of a defendant. *Id.* at 704. On appeal, the plaintiff raised multiple issues involving evidentiary rulings and jury instructions. However, the

fourth district held that the jury's special interrogatory finding limited it to considering only those errors relating to the contributory negligence finding. *Id.*

¶ 102    Although not cited by Advocate, this court discussed similar principles in *Linde v. Welch*, 95 Ill. App. 3d 581 (1981), which involved a plaintiff's claim of injury from slipping on an unnatural accumulation of ice at the defendant's building. The jury returned a verdict for the defendant and found in a special interrogatory that the plaintiff was guilty of contributory negligence (which, as stated, was at that time a complete defense to a negligence action). In addressing the issues to be resolved on appeal, this court stated:

> "Although the special finding will not be permitted to stand if it is against the manifest weight of the evidence [citation], errors which have no tendency to affect or produce the special finding will not be considered on appeal. *Vischer v. Northwestern Elevated R.R. Co.*, 256 Ill. 572 (1912). For example, in *Vischer*, a personal injury action, there was a verdict of not guilty and a special finding that none of defendant's employees was negligent. The court held that errors which could not have influenced the jury in answering the special interrogatory were harmless because the special finding was conclusive on the right of recovery. [*Id.* at 576-77.] Therefore, a special finding on a dispositive issue eliminates from appeal every alleged error which has no bearing on the controlling issue. *Draper v. Petrea*, 147 Ill. App. 164 (1909). And, as the court explained in *Tuller v. Fox*, 46 Ill. App. 97, 100 (1892):
>
> > 'When it can be known from the special findings what the jury determined to be the true state of the facts, then a reviewing court will apply the rules and principles of the law to the facts thus found, and if the general verdict of the jury is the same that the law would pronounce upon the facts, the verdict is right and must

stand, though erroneous instructions were given, provided the court can see that the error in the instructions did not contribute to lead[ing] the jury to the special findings of fact.'

In the present case, the special finding of contributory negligence is conclusive unless it is against the manifest weight of the evidence, or unless the other alleged errors had a tendency to influence the jury's deliberations on the special interrogatory." *Linde*, 95 Ill. App. 3d at 583.

¶ 103     None of the above cases involve the precise situation before us, where a reversible error has occurred, a special interrogatory finding is determinative of the liability of one defendant only, and it does not appear that the error at issue played any part in bringing about the special interrogatory finding. However, we are persuaded by the reasoning of the above cases that Advocate is correct in its argument that the special interrogatory finding that defendant Petrovic was not its apparent agent is controlling as to Advocate's liability. We agree that the error which requires reversal here appears to have no bearing on apparent agency or the special interrogatory answer. Furthermore, the plaintiff's reply brief makes no argument in reply to this issue raised by Advocate. We thus hold as to Advocate only that the verdict and judgment in its favor are affirmed.

¶ 104                                        III. CONCLUSION

¶ 105     For the reasons set forth above, we vacate the verdict and reverse the judgment entered in favor of defendants Polina Petrovic, M.D., and Chicago Imaging, Ltd., and we remand this case for a new trial consistent with this decision. We affirm the verdict and judgment entered in favor of defendant Advocate Health and Hospitals Corporation d/b/a Advocate Trinity Hospital.

¶ 106     Affirmed in part and reversed in part.

¶ 107     Cause remanded.